IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:

BUILDERS GROUP & DEVELOPMENT CORP.

     Debtor

CASE NO. 13- 04867 (ESL)

CHAPTER 11

OPINION AND ORDER

This case is before the court upon CPG/GS PR NPL, LLC's (hereinafter referred to as "CPG" or "Creditor") *Urgent Motion for Entry of Order Determining the Foreclosure of Rents and/or Prohibiting the Use of CPG/GS' Cash Collateral* alleging that Builders Group & Development Corp. (hereinafter referred to as "Builders Group" or "Debtor") has no right to use CPG's post-petition rents because the same were foreclosed and ownership of the rents was transferred pre-petition to CPG pursuant to Articles 1416 *et seq.* of the Puerto Rico Civil Code ("PR Code"), 31 L.P.R.A. §3941 *et seq.* CPG alleges that the rents do not constitute property of the estate pursuant to 11 U.S.C. §541(a)(6) (Docket No. 35). Builders Group in its *Opposition to CPG's Urgent Motion for Entry of Order Determining the Foreclosure of Rents and/or Prohibiting the Use of Cash Collateral* argues that: (i) the Debtor's interest in the rents, which constitute cash collateral, can only be extinguished by a foreclosure of the rent producing collateral pursuant to state law; thus the foreclosure of the Cupey Professional Mall is required to effect a foreclosure on the post-petition rents; and (ii) since the Cupey Professional Mall is owned by Builders Group and is property of the estate pursuant to 11 U.S.C. §541(a)(1), the rents derived from property of the estate form part of the bankruptcy estate under 11 U.S.C. §541(a)(6). For the reasons set forth below this court finds that the rents constitute property of the estate under state law and that the same constitute cash collateral to CPG's debt. The court also finds that the Debtor has not provided adequate protection to CPG for its two separate

interests; namely, its mortgage on the real property and its security interest in the post-petition rents.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(K) and (M). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

### Procedural Background

Builders Group filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on June 12, 2013. The Debtor included CPG in its Schedule D- Creditors Holding Secured Claims- as a secured creditor of two (2) mortgage loans from 08/10/2011, which amount to $9,400,000.00. The Debtor listed the value of the property subject to the mortgage lien in the amount of $11,900,000.00.

On July 10, 2013, CPG filed a *Notice of Foreclosure of Rents and Adequate Protection* informing that: (i) on or around April 7, 2011 it foreclosed on the rents of Debtor's properties, thus the same does not constitute property of the estate pursuant to 11 U.S.C. §541; and (ii) to the extent that it has not foreclosed on certain of Debtor's rents pre-petition, it does not consent to the use of its cash collateral, and thus demands adequate protection of its secured interests in the properties of Debtor (Docket No. 33). On July 11, 2013, Builders Group filed a *Motion in Response to Notice of Foreclosure of Rents and Adequate Protection* alleging that: (i) CPG fails to attach any documentation to support its allegation that it foreclosed on the rents of Builders Group properties on or around April 7, 2011; (ii) the only foreclosure that Builders Group is aware of is a complaint for foreclosure filed on August 16, 2011, months after the alleged foreclosure of rents; (iii) "[u]pon information and belief, Builders [Group] was current with Firstbank at the time of the discounted sale to CPG and CPG continued to collect, but is mute with respect to accounting for the application of the rents to the loan for approximately the last eighteen months and the disappearance of $500,000 in escrow held by Firstbank at the time of

the sale;" (iv) "Builders [Group] contends that the $2,500,000.00 of equity cushion in the Cupey Professional Mall provides adequate protection to CPG's interest in the collateral, but also offers to pay $23,961.00 in monthly adequate protection payments, essentially non-default rate interest, and well beyond the $15,000.00 tentatively agreed to between the parties prepetition; and (v) Builders Group intends to file a motion for the use of cash collateral and objects to CPG's Notice of Foreclosure (Docket No. 34).

On July 12, 2013, CPG filed an *Urgent Motion for Entry of Order Determining the Foreclosure of Rents and/or Prohibiting the Use of CPG/GS' Cash Collateral* alleging: (i) Builders Group has no right to use CPG's cash collateral, given that the same was foreclosed and transferred pre-petition to CPG and does not constitute property of the estate; (ii) Builders Group has no equity in its assets because they are substantially encumbered by CPG; and (iii) "there exists no reorganization or refinancing alternatives that could even remotely provide a viable exit strategy pursuant to which creditors, such as CPG/GS, will be paid the amount and value of their security interest" (Docket No. 35). CPG argues that the cash collateral, in this case the rents, are not property of the estate and thus belong to CPG based on the following: (i) other courts have applied a similar reasoning to pre-petition foreclosures of rents such as the one performed by CPG pursuant to the foreclosure letters; (ii) in In re Northwest Commons,Inc. 136 B.R. 215, 219 (Bankr. E.D. Mo. 1991), the Court held that after a secured lender had exercised its contractual right under the mortgage deed to notify the debtor's tenants to pay the secured lender directly all amounts due for rents as a result of a default by the debtor on its obligations to the secured lender, such notification constituted a pre-petition foreclosure on the cash collateral ("When a mortgagee completes all steps necessary to enforce its rights under an assignment of rent clause pre-petition, all interests of the Debtor in the rents are extinguished and the rents do not become property of the estate or cash collateral") Id. at 220.; (iii) in In re Century Investment Fund VIII Limited Partnership, 937 F. 2d 371, 375 (7th Cir. 1991), the Court stated in dicta that, "if a mortgagee has protected its security interests in a mortgagor's property and rental proceeds by

perfecting its liens under the requirements of state law, then those interests do not later become the property of the bankruptcy estate;" (iv) in In re VII South Michigan Associates, 145 B.R. 912, 914-915 (N.D. Ill. 1992), the court followed a similar reasoning by stating that a creditor who sent demand letters to tenants after the debtor's default but prior to the debtor's chapter 11 proceeding, divested the bankruptcy estate from ownership of the rents because the creditor had "perfected" and "enforced" its rent assignment;" (v) "… other cases have reached similar results, concluding that if a creditor takes sufficient steps to 'enforce' the assignment (usually making demand after default and sending notices to tenants for direct payment of the rents), the creditor cuts off ownership of the rents because the creditor has taken the steps required under the assignment and state law to entitle it to immediate possession of the rents. See In re South Pointe Associates, 161 B.R. 224 (Bankr. E.D. Mo. 1993)("The court finds that under Missouri law, a creditor holding an assignment of rents is entitled to possession of the rents after default and sending demand letters to tenants.  Because the creditor completed these enforcement steps pre-petition, the court rules that the creditor cut off the debtor's ownership in the rents and the rents were not property of the estate"); In re Mount Pleasant Limited Partnership, 144 B.R. 727 (Bankr. W.D. Mich. 1992) ("The court finds that under Michigan assignment of rents statute, the holder of assignment of rents is entitled to possession of rents upon serving a notice of default and demand for rents on tenants. Once these enforcement steps are completed, the creditor cuts off debtor's ownership of the rents) (Docket No. 35). CPG further alleges that: "…following Puerto Rico law, properly sent the [f]oreclosure [l]etters prior to the [p]etition date and, accordingly, and in line with the cases described above, divested the Debtor of all title and interest in the foreclosed rents" (Docket No. 35).

On July 15, 2013, the Debtor filed a *Motion for Entry of an Interim Order on an Expedited Basis* requesting (i) authorization to use the cash collateral; namely the rents generated by the shopping mall, (ii) to grant the adequate protection monthly payments in the amount of $23,961.00 to CPG and (iii) the scheduling of a final hearing to determine whether the rents

(cash collateral) are property of the estate or of the Creditor (Docket No. 38). On July 18, 2013, Builders Group filed a *Motion in Opposition to CPG's Urgent Motion for Entry of Order Determining the Foreclosure of Rents and/or Prohibiting the Use of Cash Collateral* arguing that the post-petition rents are property of the estate based on the following: (i) the cases cited by CPG conclude that; "the debtor's interest in the rents, which constituted cash collateral, can be extinguished only by a foreclosure of the rent producing collateral pursuant to state law;" (ii) "[a]pplied to the present case, CPG has to conclude that foreclosure on the Mall is required to effect a foreclosure on the post-petition rents;" (iii) "[t]he statutory language set forth in §§363(a), 363(c)(2)(B), 541(a)(6) and 552 contemplates rents, including those which are the subject of perfected assignments, as property of the estate. In this sense, the notification to tenants and collection of rents prepetition by a mere letter notice is really an enforcement mechanism for collection, rather than the ultimate foreclosure of an interest in property;" (iv) in In re Mullen, 172 B.R. 473, 475 (Bankr. D. Mass. 1994) the court stated; "[i]n collecting rents, a creditor holding a rent assignment is obviously realizing upon its collateral. The collection of rents is therefore foreclosure of a security interest under another name. Assuming a debtor has reasonable prospects of reorganization, a creditor otherwise entitled to foreclose may do not do so unless cause, including lack of adequate protection, exists to vacate or modify the automatic stay against foreclosure;" and (v) "[i]n the present case, where the assignment recognized the prior construction loan agreement and granted Builders the right to collect the rents and CPG (then Firstbank) the right to collect only in the event of default under the notes, and only until such time as the default is cured, it is apparent that it affords CPG (Firstbank), as lender-assignee, only additional security for the debt" (Docket No. 40).

On July 19, 2013, the court entered an *Interim Order* authorizing Builders Group to use cash collateral only for operating expenses as provided for in the cash flow projections, granting replacement liens, and ordering the Debtor to make monthly payments of $23,961.00 due on the 15th of each month. The court scheduled a hearing for August 26, 2013 (Docket No. 41).

On the same date, that is, July 19, 2013, CPG filed a *Motion to Alter or Amend Interim Order (Docket No. 41) and Opposition to Debtor's Use of Cash Collateral* premised on the following: (i) the cash collateral is the property of CPG and thus does not form part of the bankruptcy estate; (ii) alternatively, Builders Group cannot show the existence of sufficient adequate protection to warrant the use of CPG's cash collateral because there is no proof of an existing equity cushion and the Debtor does not have the financial capacity to make the monthly payments to CPG; and (iii) the Debtor should not be allowed to relitigate in this forum issues which constitute *res judicata* (Docket No. 42). On July 20, 2013, Builders Group filed a *Motion in Opposition to CPG's Motion to Alter or Amend Interim Order (Docket No. 41)* arguing that CPG has failed to show a manifest error of law or fact, newly discovered evidence or previously unavailable evidence, manifest injustice or an intervening change in controlling law, and thus its request to alter or amend interim Order under Fed. R. Civ. P. 59(e) should be denied. Builders Group also states that at the 341 meeting of creditors, CPG was concerned about whether Builders will assume or reject the commercial lease contracts. Builders Group contends that the logical conclusion is that the rents are property of the estate, given that the assumption or rejection of the leases determines whether the rents even exist (Docket No. 43). On July 22, 2013, the court ordered and noticed that the objection to Debtor's use of cash collateral and to alter or amend the interim Order entered on 07/19/2013 filed by CPG (Docket No. 42) and Debtor's opposition to the same (Docket No. 43) be heard at the hearing scheduled for 08/26/2013 (Docket No. 45).

On July 29, 2013, CPG filed an *Urgent Motion to Schedule Hearing to Consider CPG/GS' Foreclosure of Rents (Docket No. 35)* because it is CPG's position that the determination of the urgent motion is not only indispensable for these proceedings, but it is also mandatory in order for Builders Group to persuade the court to approve the cash collateral motion since the court must first resolve whether the cash collateral constitutes part of the Debtor's bankruptcy estate (Docket No. 50). CPG also filed a *Motion for Leave to Reply to*

*Debtor's Opposition to Urgent Motion on Foreclosure of Rents* requesting a seven (7) day extension of time until August 5, 2013 to file its reply (Docket No. 51). On August 1, 2013, Builders Group filed an *Urgent Motion in Opposition to CPG's (A) Request for Urgent Hearing and (B) Leave to File Reply* (Docket No. 54). On August 2, 2013, CPG filed its *Supplement to its Rule 9023 Motion (Docket No. 42) to Amend and Clarify Interim Order Authorizing Debtor to Use Cash Collateral (Docket No. 41)* including these additional arguments: (i) "[t]he lessees received pre-petition notice of default, and the assignment previously perfected, completing then the transfer from Debtor to CPG of whatever property rights Debtor had in each lessee's rent payable;" (ii) "[t]he language of the Collateral Assignment paragraph (1) (as well as paragraph SEVENTH (b) of …each of the Mortgage Deeds), underscores the conclusion that, under Puerto Rico law, the rents became CPG/GS' property when the lessees received notice of Debtor's default and the assignment of rents;" and (iii) CPG requests that the Interim Order be clarified or amended to clarify that the rents from the Cupey Professional Mall subsequent to the default notice date (April 7, 2011), are property of CPG and thus, Debtor may not use such property (Docket No. 55).

On August 2, 2013, the court scheduled an expedited hearing for 08/06/2013 to consider: (i) the Urgent motion to schedule hearing to consider CPG/GS foreclosure of rents (Docket No. 50) filed by CPG and Debtor's Urgent motion in opposition (Docket No. 54) (Docket No. 59).

On August 5, 2013, the Debtor filed a *Motion to Strike Supplement to CPG/GS' Rule 9023 Motion (Dkt. No. 55)* alleging that CPG raises new arguments that should have been presented in its earlier memorandum and rehashes old arguments, violating the requirements for leave to reply found in L.Cv.R. 7(c) (D.P.R. 2009) and P.R. LBR 1001-1(b) (Docket No. 55). On August 5, 2013, CPG filed its *Preliminary Response to Docket No. 54* (Docket No. 65). On August 5, 2013, CPG filed its *Reply to Debtor's Opposition to CPG/GS' Urgent Motion for Entry of Order Determining the Foreclosure of Rents and/or Prohibiting the Use of Cash Collateral (Docket No. 40)* focusing on the indispensable threshold issue; namely whether CPG

-7-

is the rightful owner of the rents generated by the Cupey Professional Mall pursuant to Puerto Rico Law (Docket No. 66). CPG contends that it is the rightful owner of the rents under Puerto Rico Law based on the following arguments: (i) the perfection of assignment of rents in Puerto Rico is governed by the Civil Code of Puerto Rico ("Civil Code") as the same were expressly excluded from the Puerto Rico Commercial Transactions Act ("PR UCC") pursuant to §9-104(j). Laws of P.R. Ann. Tit. 19 §2004(j). "The exclusion is a recognition that the differences of real property law from jurisdiction to jurisdiction makes uniformity extremely unlikely, as well as the fact that courts, and commentators alike, have considered that a right to receive rents under a lease agreement is more properly characterized as a real estate interest, hence, not subject to application under Article 9 of the UCC;" (ii) Article 1065 of the PR Civil Code provides that all the rights acquired by virtue of an obligation are transmissible, subject to the law and absent a stipulation to the contrary. 31 L.P.R.A. §3029. The Civil Code does not specifically define the term "assignment," instead it lists the effects that assignments have over contracting parties, as well as other third parties;" citing José Ramón Vélez Torres, Derecho de Obligaciones, 2nd ed., p. 251, Universidad Interamericana de Puerto Rico, Facultad de Derecho, 1997; (iii) Article 1416 of the Civil Code states that; "[t]he assignment of a credit, right, or action shall produce no effect against a third person but from the time the date is considered fixed, in accordance with §§3273 and 3282 of this title" Laws of P.R. Ann., Tit. 31 §3941. Pursuant to Article 1416, an assignment will not be effective as against third parties until after the time the date is considered fixed; (iv) the Civil Code provides the following methods by which an assignment is considered to have a fixed date; namely, (a) execution of the assignment on a public document; (b) the filing of a private assignment document in a public registry, and/or (c) delivery of the assignment to a competent public official. 31 L.P.R.A. §§3273 and 3282. The Puerto Rico Supreme Court in Building Maintenance Services, Inc. v. Hato Rey Executive Building, Inc., 109 D.P.R. 659 (1980) held that the fixed date requirement for an assignment contract pursuant to Article 1416 was satisfied if the document was executed before a Notary Public under an affidavit; (v) "Once

the assignment meets the fixed date criteria of article 1416, the same becomes binding, valid and enforceable *erga omnes*. At such time, the assignee acquires full rights ownership over the assigned obligations inasmuch as the assignment is 'an operation by which a third party, in substitution of the original creditor, becomes the effective titleholder of an obligation which, notwithstanding remains the same" citing José Ramón Vélez Torres, Derecho de Obligaciones, 2nd ed., p. 251, Universidad Interamericana de Puerto Rico, Facultad de Derecho, 1997, quoting Federico Puig Peña, Compendio de Derecho Civil Español, To. III, #rd. ed., Madrid, Ediciones Pirámide, 1976, p. 37; (vi) "[A]rticle 1417 of the Puerto Rico Civil Code requires that, in order to effectively link the debtor with the assignee of a credit, notice to the debtor of the assignment (or proof of knowledge of the same) is required. Laws of P.R. Ann., Tit. 31 §3942; and (vii) the Civil Code does not specify a particular form or manner of the notification required to link a debtor with an assignee. It only requires that the debtor have knowledge as to the existence of the assignment rather than a specific notice document" Eduardo Vázquez Bote, Tratado Teórico, Práctio y Crítico de Derecho Privado Puertorriqueño, T. V, §8.5, p. 334, Equity Publishing, 1991. CPG further argues that in the instant case, it acquired ownership of the rents pursuant to the Civil Code and state jurisprudence based upon the following: (i) Debtor entered into a "Collateral Assignment of Lease Agreements and Rents" (the "Assignment") of the rents generated by the Shopping Center with CPG/GS (then FBPR) on May 18, 2004. The Assignment was executed by the parties before a Notary Public and certified through an affidavit;" (ii) Pursuant to Article 1416 of the PR Civil Code and interpretative jurisprudence, "the Assignment became binding, valid, and opposable against third parties on May 18, 2004." "…CPG/GS, as the substitute of FBPR, acquired conditional title over the rents as of May 18, 2004, subject to the declaration of a default by Secured Creditor;" (iii) prior to the petition date, Builders Group defaulted on its obligations under the Loan Documents, which defaults were duly notified to Debtor; (iv) "Debtor recognized these defaults, as well recognized the validity and effectiveness of the Assignment (and their notifications thereto), and even ratified and agreed to CPG/GS'

-9-

continued collection of the Assignment on August 24, 2010 (the "Forbearance Agreement");" (v) as a result of such defaults, on or about April 7, 2011, CPG sent the foreclosure letters to certain of the Debtor's tenants as authorized by the Civil Code, the Cash Collateral Security Agreements, the Assignment and the Forbearance Agreement; and (vi) due to the defaults, CPG commenced a state court case on August 16, 2011 for foreclosure of mortgages and collection of monies before the Puerto Rico Court of First Instance, San Juan Section, Civil Num. KCD2011-1828 in which CPG obtained a Judgment in its favor. The Judgment was upheld in the Puerto Rico Court of Appeals and the Supreme Court of Puerto Rico (Docket No. 66).[1]

An evidentiary hearing was held on August 6, 2013.[2] The following matters were addressed: (i) Builders Group status report; (ii) the U.S. Trustee's request for a fourteen (14) day period of time to state its position regarding the application to employ of CPA/Insolvency and Restructuring Advisors, Monger Robertin & Asociados, Inc. (Docket No. 13); and (iii) the contested matter regarding the foreclosure of the rents (Docket Nos. 74 & 77). The Debtor and CPG agreed to submit jointly Exhibits I and II which correspond to the Collateral Assignment of Lease Agreement and the Forbearance Agreement, respectively. Debtor objected to Identification III, the foreclosure letters and Identification IV, the state court Judgment. The court stated that it may take judicial notice over the state court Judgment (Docket No. 77). CPG proffered at the hearing that the basic facts are the following: (1) "[o]n May 2004, the Debtor executed a

---

[1] CPG in this motion presents other issues regarding the use of cash collateral which the court will not address at this juncture. The additional issues consist of the following; (i) the state court Judgment precludes the issue as to the amount of the debt through both collateral estoppel and the Rooker-Feldman doctrine; (ii) Debtor's claim for recovery of monies under 11 U.S.C. §506(c) is legally insufficient; (iii) Debtor's claims for additional relief such as the alleged violation of the automatic stay are not applicable; (v) Debtor's request for injunctive relief or other equitable relief against a non-debtor entity, the request for recovery of monies under 11 U.S.C. 506(c) are all procedurally defective because they require the filing of an adversary proceeding in conformity with Fed. R. Bankr. P. 7001; (iv) Debtor's use of funds which constitute cash collateral prior to the Interim Order violate 11 U.S.C. §363; and (v) the Court should prohibit the use of any cash collateral due to Builders Group inability to properly administer the shopping center.

[2] On that same date, CPG initiated an adversary proceeding (Adversary Proceeding No. 13-00165) against Debtor requesting a declaratory judgment on CPG's title to rents derived from the Cupey Professional Mall and consignment of funds.

collateral assignment of lease agreement and rights (Joint Exhibit I) by which the Debtor assigned to the predecessor Lender the rents that were generated by the Cupey Professional Mall as collateral for the loan;" (2) "Debtor in the year 2010 defaulted on its obligations under the agreement with the Lender and thus entered into a forbearance agreement (Joint Exhibit II) by which Debtor acknowledges that there was a default, that the rents were notified or foreclosed, acknowledges and amends the collateral assignment of leases to provide that the conditional assignment based upon default, the default language would be stricken out and the assignment was not in the event of default but rather an assignment of these rents;" (3) [t]he Debtor subsequently defaulted and the loans were assigned to CPG/GS. CPG/GS filed a collection of monies action in state court and obtained a Judgment and the same reflects that the defaults continued;" and (4) "[t]he letters (Exhibit 3) sent jointly by FirstBank and CPG/GS on April 7, 2011 instructing all lessees that all rent payments under the leases of the Cupey Professional Mall must be made to CPG/GS" (Docket No. 77). The court noted at the hearing that it is an uncontested fact that the lessees were given notice that they should remit payment to CPG, thus the court does not need the letters. The court granted the Debtor and CPG five (5) working days to supplement their legal memorandum and thereafter the matter regarding whether the rents are property of CPG or collateral in favor of CPG will be deemed submitted (Docket No. 77).

On August 12, 2013, CPG filed its *Memorandum Brief and Supplement to Dockets Nos. 35 and 66* (Docket No. 73). CPG sustains its position that the rents generated by the shopping center are not property of the bankruptcy estate and has included the following additional legal arguments; (i) "[t]he Supreme Court of Puerto Rico has defined an assignment as that 'legal vehicle by which the assigning creditor transmits to the assignee the ownership over the assigned credit.' IBEC Housing Int'l v. Banco Commercial de Mayaguez, 117 D.P.R. 371, 377 (1986), citing L. Diez-Picazo, Fundamentos del Derecho Civil Patrimonial, Madrid, Ed. Tecnos, 1979, Vol. 1, pg. 789. The Puerto Rico Supreme Court has explicitly ruled that an assignment of rents is an assignment of credits as per Article 1065 of the Civil Code. Building Maintenance Serv. v.

<u>Hato Rey Executive Bldg., Inc.</u>,109 D.P.R. 656 (1980)" (Docket No. 73, paragraph 30, pg. 10); (ii) "[t]his transfer of ownership of the assigned credit upon 'perfection' of the assignment has been recognized on numerous occasions by the Puerto Rico case law. <u>See</u> <u>Consejo de Titulares del Condominio Orquídeas v. C.R.U.V.</u>, 132 D.P.R. 707 (1993) ("Upon transmittal of the credit, the assignee installs himself in the same position and obligatory relationship with the debtor"); <u>See also</u>; <u>PRTC v. All Systems Electronics, Inc.</u>, 2001 PR App. Lexis 375, *18-20 (2001); <u>Doral Fin. Corp. v. Dorado Real</u>, 2013 PR App. Lexis 1866, *23-24 (2013)" (Docket No. 73, paragraph 35, pg. 11); (iii) "…the Assignment provides that [CPG's] ownership over the rents generated by the Shopping Center was conditioned upon 'the event [that Debtor] defaults its obligations under [the Loans]" (Docket No. 73, paragraph 42, pg. 13); (iv) "According to the Assignment as executed, the Secured Creditor's title over the rents was predicated upon the occurrence of a particular condition precedent ('condición suspensiva'), i.e., Debtor's default under the Loans" (Docket No. 73, paragraph 42, pg. 13) and; (v) CPG became the full and unconditional owner of the rents since August 24, 2010 (Docket No. 73).

On August 13, 2013, Builders Group filed a *Motion in Compliance with Court's Order at Hearing of August 6, 2013* presenting the following additional allegations and arguments: (i) Builders concedes that there was a pre-petition assignment and that the post-petition rents constitute CPG's cash collateral; (ii) there is a line of cases that has held that debtor's interest in the rents, which constitutes cash collateral, can be extinguished only by a foreclosure of the rent producing collateral citing <u>In re Mullen</u>, 172 B.R. 473 (Bankr. D. Mass. 1994); <u>In re Willows of Coventry, Ltd. Partnership</u>, 154 B.R. 959 (Bankr. N.D. Ind, 1993); <u>In re Mews Assoc., L.P.</u>, 144 B.R. 867 (Bankr. W.D. Mo. 1992); <u>In re Bethesda Air Rights Ltd. Partnership</u>, 117 B.R. 202 (Bankr. D. Md. 1990); <u>Principal Mut. Life Ins. Co. v. Atrium Dev. Co.</u> (<u>In re Atrium Dev. Co.</u>), 159 B.R. 464 (Bankr, E.D. Va. 1993); <u>In re Newberry Square</u>, 175 B.R. 910 (Bankr. E.D. Mich. 1994); (iii) in <u>In re South Side House, LLC</u>, 474 B.R. 391 (Bankr. E.D.N.Y. 2012), "…the bankruptcy court squarely faced the issue of whether post-petition rental income generated by

the debtor's property was property of the estate and cash collateral or whether pursuant to a pre-petition assignment of rents, they never came into the estate. Citing New York Law, the court differentiated types of assignments, such as where an assignment is additional security for a mortgage loan, or alternatively, where it is an absolute or conditional assignment. [In re] South Side House, LLC, 474 B.R. at 403. The bankruptcy court concluded that '[w]hen an assignment is for additional security, the lender has a lien on the rents, but title to the rents remains with the borrower.' Id." (Docket No. 76, paragraph 7a, pgs. 4-5); (iv) "Courts in other circuits have reached the same conclusion;" In re South Side House, LLC citing In re Buttermilk Towne Ctr., LLC, 442 B.R. 558, 564 (B.A.P. 6th Cir. 2010); In re Senior Hous. Alternatives., Inc., 444 B.R. 386, 401 (Bankr. E.D. Tenn. 2011); In re May, 169 B.R. 462 (Bankr. S.D. Ga. 1994); the court in In re Senior Hous. Alternatives, Inc. cites Lyons v. Federal Sav. Bank (In re Lyons), 193 B.R. 637, 648 (Bankr. D. Mass. 1996) "…for the proposition that, '[t]he fact that the assignments are conditioned upon default and will terminate upon satisfaction of the debt indicates that they are merely additional security for the loan, and not an absolute transfer of the Debtor's interest in the rents to the Banks;'" In re Senior Hous. Alternatives, Inc., 444 B.R. at 398 (Docket No. 76, paragraph, 7b, pgs. 5-6); (v) "…the bankruptcy court in [In re] Senior Hous. Alternatives, Inc., concluded that at a minimum, the debtor retained 'at least one lingering interest in the rents' related to the fact that upon payment of the underlying note, the assignment would be nullified, and the rents would return to the debtor and this equitable interest constituted property of the estate pursuant to the unambiguous language of 11 U.S.C. §541(a)(6)" (Docket No. 76, paragraph 7(b), pgs. 6-7); and (vi) in In re Amaravathi Ltd. Partnership, 2010 Bankr. Lexis 5306 (Bankr. S.D. Tex. 2010), the court concluded, "… that since the properties were owned by the debtors and the real properties are properties of the estate under 11 U.S.C. §541(a)(1), there is no doubt that the rents, which are derived from the properties of the estate, themselves are property of the estate pursuant to the unambiguous language of 11 U.S.C. §541(a)(6)" (Docket No. 76, paragraph 7c, pg. 7).

On August 26, 2013, a final hearing regarding the use of cash collateral by Builders Group and CPG's objection to Debtor's use of the cash collateral was held in which the Court ordered the parties to file proposed findings of fact and conclusions of law regarding the legal controversy of whether the rents generated by the mall constitute property of the estate and the issue of whether Debtor is providing adequate protection for CPG's cash collateral (the rents) pursuant to 11 U.S.C. §363(e) and (p) (Docket No. 87).

On September 4, 2013, CPG filed its *Proposed Findings of Fact and Conclusions of Law on Contested matters (Dockets No. 35, 38, 41, 42, 55)* (Docket No. 91). On September 4, 2013, Builders Group filed its *Proposed Findings of Fact and Conclusions of Law* (Docket No. 92).

<u>Positions of the Parties regarding ownership (title) of post-petition rents</u>

Both parties have submitted motions, which have been supplemented throughout the case, regarding the legal issue as to the ownership of the post-petition rents which are generated by the Debtor's shopping center. The parties disagree in two (2) core elements; namely: (1) the supporting document which should be used to evince whether the post-petition rents are property of the estate or of CPG; and (2) the particular source of law that should be used in determining the title (ownership) of post-petition rents generated by Debtor's commercial property. CPG argues that the controlling document is the Collateral Assignment of Lease Agreement and Rents which was executed in tandem with the loan documents and the mortgage deeds. Builders Group contends that the controlling documents are the two (2) Mortgage Deeds which provide the collateral to secure the various loan agreements with certain real property which were executed between Debtor and FirstBank (the predecessor secured creditor). CPG argues that the Collateral Assignment of Lease Agreement and Rents transfers the ownership upon an event of default and that the applicable law are Articles 1416 *et seq.* of the Civil Code of Puerto Rico, 31 L.P.R.A. §3941 *et seq.*, the limited state law jurisprudence which has discussed the juridical figure of the cession of credit, and Spaniard commentators that have discussed this juridical figures based on the corresponding articles of the Civil Code of Spain. The court notes that the term cession of

credit has been translated as assignment of credit by the Laws of Puerto Rico Annotated. In addition, the court notes that the basis of the Civil Code of Puerto Rico is, in essence, the Civil Code of Spain, which was adopted by Puerto Rico in the year 1889 and was revised in the years 1902 and 1930, and in later years with very few amendments.

Contrary to CPG, Builders Group argues that the controlling documents are the two (2) Mortgage Deeds and that pursuant to the controlling clause in paragraph seventh, in order for CPG or a secured creditor to be entitled to the rents it must have foreclosed on the property. Moreover, Builders Group argues that the controlling law is the Bankruptcy Code; in particular Section 541(a)(6) which the Debtor argues pre-empts state law and the United States Supreme Court decision in <u>Butner v. U.S.</u>, 440 U.S. 48 (1979). Builders Group bases its argument on the case of <u>Amaravathi Ltd. Partnership</u>, 416 B.R. 618 (Bankr. S.D. Tex. 2009) in which the court held that the post-petition rents were property of the estate because Section 541(a)(6) governed the outcome of the case since it mandates that rents generated from property of the estate be included within the bankruptcy estate.

Findings of Fact

1. Prior to the petition date, Builders Group entered into various loan agreements with FirstBank (CPG is the successor creditor), pursuant to which FirstBank as the pre-decessor creditor provided certain credit facilities to the Debtor which are evidenced by the loan documents.

2. The loans are secured by, among other things, certain real property that is described in detail in the mortgage deeds. The real estate collateral is the Cupey Professional Mall.

3. The Debtor generates rental income from the Shopping Center, which was pledged to CPG.

4. As part of the loan documents and collateral for the loans, on May 18, 2004, the Debtor granted CPG a pre-petition "Collateral Assignment of Lease Agreements and Rents," as

attested through an affidavit issued by a Notary Public, which provided a lien in favor of CPG over the rents generated by the Cupey Professional Mall.

5. Prior to the petition date, Debtor defaulted on its obligations under the loan documents, which defaults were duly notified to the Debtor.

6. The Debtor admitted to these defaults by and through the Forbearance Agreement executed on August 24, 2010, which was attested through an affidavit before a Notary Public.

7. On or about April 7, 2011, as a result of such defaults, CPG sent letters to certain of the Cupey Professional Mall's tenants, as authorized by the "Collateral Assignment of Lease Agreements and Rents" and the Forbearance Agreement, instructing such tenants to remit payments directly to CPG.

8. As a result of the defaults, on August 16, 2011, CPG commenced a civil action for foreclosure of mortgages and collection of money in the Puerto Rico Court of First Instance, San Juan Section, Civil Case No. K CD2011-1828.

9. Prior to the petition date, CPG obtained Judgment in its favor in the state court case. The Judgment was upheld in the Puerto Rico Court of Appeals as well as the Supreme Court of Puerto Rico.

10. Builders Group filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on June 12, 2013.

11. Builders Group included CPG in its Schedule D-Creditors Holding Secured Claims- as a secured creditor of two (2) mortgage loans from 08/10/2011, which amount to $9,400,000.00. The Debtor listed the value of the property subject to the mortgage line in the amount of $11,900,000.

12. CPG filed a proof of claim on August 26, 2013, in the amount of $23,057,297.28 including its secured portion of $8,731,063.00 (the remaining $14,326,34.28 are listed as unsecured). These amounts were stipulated by the Debtor for purposes of the cash collateral hearing.

13. Mr. Héctor del Rio is the asset manager of the loans which are secured by the Cupey Professional Mall and manages the accounts and everything related to these loans.

14. Mr. del Rio as part of his job has visited monthly the Cupey Professional Mall since the acquisition of these loans in late February 2011. The property has deteriorated since he first started visiting the property in the year 2011.

15. CPG has been collecting the rents from the Cupey Professional Mall commencing on or about April 2011 until the petition date. CPG has collected on average total monthly rents from the shopping center in amounts ranging from $35,000 to $40,000. However, since the entry of the Interim Order on July 19, 2013, the Debtor is the only party collecting and/or receiving the rents.

16. According to the testimony of Mr. José Monge Robertin, CPA and Insolvency and Restructuring Advisor, Debtor collected rental income in the amounts of $1,100.00 in June 2013, $21,542.79 during the month of July 2013, and $77,164.24 during the month of August 2013. CPA Monge projected revenues in the amount of $114,552.00 for the month of September 2013.

17. The $77,164.24 rental income for the month of August 2013 referred to by Mr. Monge includes, and takes into account, the $46,672.56 amount consigned by CPG on August 6, 2013.

18. The Debtor has not met the projected revenues for the months of June, July and August 2013.

19. The $400,000.00 proposed renewal fee with Wendy's has not been paid to date, and will be paid when and if the parties enter into a new lease agreement.

20. The projections for the rental income are based on the contracts, the tenants and the rental space. The CAM (common area management expenses) is part of certain rental agreements in which the lessor separates a budget and includes as part of the payment, the tenant's participation in the CAM expenses. The CAM payments include: common electrical

expenses, common water expenses, cleaning, maintenance, security, insurance, all the expenses related to the management of the mall.

21. The September 2013 projection includes the addition of three (3) new leases. However, as of August 26, 2013 there have been no deposits paid for these leases.

22. Debtor projected total revenues of $1,216,864.00 for the six (6) months period commencing on July 2013 and ending on December 2013. However, there is no specific rent roll identifying and supporting the projections.

23. Debtor's tax return for the calendar year 2012, reported in line item #11, rental income in the amount of $954,146, and in line item #47 of the tax return, a net loss of $3.3 million was listed for the year 2012.

24. Debtor's tax return for the calendar year 2011, reported in line item #11, rental income in the amount of $565,808, and in line item #47 of the tax return, a net loss of $102,000 was listed for the year 2012.

25. CPG makes no payments for electric or water services for the shopping center, but does pay for property insurance for the mall.

26. Builders Group's expenses include electricity, security guards, elevator maintenance, exterminating, landscaping, garbage disposal, maintenance employees, janitorial services, water, telephone, management, taxes, medical insurance and other necessary expenses.

27. The shopping center has been deteriorating since February 2011 and has continued to deteriorate to date. The shopping center is in need of repairs and large line items have been proposed, including roof and window repairs, a new principal elevator, remodeling of the existing elevators, repairs of the perimeter fence, the trash container area, an emergency generator, security camera system upgrades and an access control system.

28. Debtor recognizes the need for near-term repairs to the shopping center. However, the improvements to the shopping center have not been made due, in part, to the fact that the purported renewal fee with Wendy's has not been paid.

29.    Builders agreed for purposes of the cash collateral hearing that the amount of CPG's secured claim is $8,731,063.00, which is also the value of the mall.

30.    Builders Group originally offered CPG both an equity cushion and $23,961.00 in monthly adequate protection payments which was based on an estimate of CPG's secured portion of the debt in the amount of $9,400,000.

31.    At the August 26, 2013 hearing, Builders offered CPG monthly adequate protection payments of 3.05% (annualized), which is 2 and 3/8 percent over LIBOR (London Interbank Offered Rate) (the same rate as the original loan), and based on CPA Monge's testimony.

32.    At 3.05% the annual adequate protection payment to CPG would be $266,297.42 or $22,191.45 monthly.

Commercial Mortgage Transactions and Assignment of Rents

There are two (2) prevailing common law theories which govern a mortgagee's rights to rents as security; namely, the "title" and "lien" theory. Under the title theory, the mortgagee receives all incidents of the legal title which includes the right to possession of the land and the right to collect rents from the land. The mortgagee may exercise its rights prior to the mortgagor's default, unless otherwise agreed. See R. Wilson Freyermuth, *Modernizing Security in Rents: The New Uniform Assignment of Rents Act*, 71 Mo. L. Rev. 1, 6 (Winter 2006). Under the lien theory, which is the theory prevailing in most American states, the mortgagor has legal title over the land and the mortgage deed grants the mortgagee a right of security which is enforceable via foreclosure in the event of a default by mortgagor. Until such enforcement occurs, the mortgage does not convey to the mortgagee legal title to the land. Id. at 6. The mortgage deed does not by itself convey the incidents of title, such as the right to collect rents accruing from the land. "This means that a lien theory mortgagee would have no way to collect rents (at least those rents that accrued prior to completion of a foreclosure sale) unless the mortgage documentation specifically assigned those rents as collateral. Thus, in lien theory

states, it became customary for a commercial mortgage lender to require the mortgagor to execute an assignment of leases and rents from the mortgaged real property (in addition to the mortgage itself)." Id. at 7. The documentation in nearly all commercial mortgage transactions includes an express assignment of rents which can be included in the mortgage itself, in a separate document or both. Id. at. 22.

The relevance of whether the "lien" or "title" theory applies is that in lien theory states, the secured lender is not entitled to possession of the rents, unless the mortgage documentation specifically assigned those rents as collateral. "Thus, bankruptcy courts applying the law of lien theory states are generally reluctant to uphold an absolute transfer of rents unless it is clear from the language of the instrument and the context of the transaction that the parties intended the assignment to be absolute in nature." See Jeral Ancel and Jeffrey Graham, *Post-Petition Rents as Property of the Estate: State or Federal Law?*, 29-6 ABIJ 44 (August 2010). Moreover, "[m]ost bankruptcy courts are hesitant to construe an assignment of rents as an absolute transfer of rights because most states adhere to a 'lien theory' rather than a 'title theory." Id. at 44. An "absolute assignment" will include language to the effect that it is "not merely for purposes of security" and "that the borrower no longer has an interest in unaccrued rents other than a revocable license (or that the borrower no longer has a property right) to collect such rents prior to the to the borrower's default." See R. Wilson Freyermuth, *Modernizing Security in Rents: The New Uniform Assignment of Rents Act*, 71 Mo. L. Rev. 1, 30 (Winter 2006). In "title theory" states, an assignment of rents makes an immediate transfer of all rights to receive the rents to the lender and the borrower retains a revocable license to collect the rents. Id. at 45. Thus, "bankruptcy courts applying the law of the 'title theory' state are more apt to give effect to an absolute assignment of rents without inquiring beyond the language of the instrument to determine the intent of the parties." Id. at 45. However, "[t]he majority of cases to consider language in a security agreement granting a mortgagee an alleged absolute assignment of rents have found the true nature of the mortgagee's interest to be no more than security even in those states following

the 'title theory' of mortgages. See e.g., In re McCann, 140 B.R. 926, 927 (Bankr. D. Mass. 1992); In Bethesda Air Rights Limited Partnership, 117 B.R. 202, 206 (Bankr. D. Md. 1990) ("title theory" state); In re Willowood East Apartments of Indianapolis II, Ltd., 114 B.R. 138, 141 (Bankr. S.D. Ohio 1990)." In re Buttermilk Towne Ctr., LLC, 442 B.R. 558, 563 (B.A.P. 6th Cir. 2010) citing In re Guardian Realty Group, LLC, 205 B.R. 1 (Bankr. D. D.C. 1997).

The crucial question is whether Puerto Rico falls under the "title" or "lien" theory. In Puerto Rico, mortgages are governed by both the Civil Code of Puerto Rico and the Mortgage Law of Puerto Rico. Article 1756 of the Civil Code of Puerto Rico provides that, "[t]he following are essential requisites of the contracts of pledge and of mortgage:

(1) That they be constituted to secure the fulfilment of a principal obligation.

(2) That the thing pledged or mortgaged is owned by the person who pledges or mortgages it.

(3) That the persons who constitute the pledge or mortgage have the free disposition of their property, and, should they not have it, that they are legally authorized for the purpose." 31 L.P.R.A. §5001.

Article 1757 of the Civil Code of Puerto Rico provides, "[i]t is also essential in these contracts that when the principal obligation is due, the things of which the pledge or mortgage consists may be alienated to pay the creditor." 31 L.P.R.A. §5002.

The Supreme Court of Puerto Rico, has held that a mortgage is "a property right over the real property of the debtor or of a third person, belonging to the creditor—by reason of the recording thereafter—by virtue of which right the creditor acquires the power to claim it, no matter in whose possession it is, in order to be paid the price of the same, with the preference corresponding to the order of its recording, even though the debtor or third person retains the mortgaged thing in his possession and the power to dispose of it." See Liechty v. Descartes Saurí, 9 P.R. Offic. Trans. 660, 667, 109 D.P.R. 496 (1980) citing Puig Peña's definition in II Compendio de Derecho Civil 623 (1972 ed.). Thus, pursuant to the Civil Code of Puerto Rico

-21-

and the Mortgage Law of Puerto Rico, it is the mortgagor that remains with the legal title over the property and the mortgage deed grants the mortgagee, once the mortgage deed is duly recorded (due to its constitute nature) in the Property Registry, "the security produces real effects and becomes operative *erga omnes* in the sphere of real rights." See Rosario Pérez v. Registrar, 15 P.R. Offic. Trans. 644, 648, 115 D.P.R. 491, 494 (1984); Article 1774 of the Puerto Rico Civil Code, 31 L.P.R.A. §5042; Article 188 of the Mortgage Law of Puerto Rico, 30 L.P.R.A. §2607. In the event of default by mortgagor, the mortgage deed grants the mortgagee the real right to foreclose on the property. See Article 210 of the Mortgage Law of Puerto Rico, 30 L.P.R.A. §2701. The First Circuit Court of Appeals has held that, "[u]nder Puerto Rico law, the registration is a 'constitutive' act for a mortgage, and without the existence of a mortgage, a creditor only has an unsecured personal obligation regarding the underlying debt." Soto-Ríos v. BPPR (In re Soto-Ríos), 662 F. 3d 112, 121 (1st Cir. 2011).

In Puerto Rico, a mortgage has an accessory nature, meaning that it is an accessory property right, in terms of the existence of a principal obligation serving as a security. See Liechty v. Descartes Saurí, 9 P.R. Offic. Trans. 660, 666, 109 D.P.R. 496 (1980). It is an essential requirement of a mortgage that it be executed to secure the performance of a principal obligation. "The mortgage contract presupposes the existence of two legal concepts, to wit, a principal obligation and the mortgage itself, which serves as security to the former's creditor. A mortgage cannot be thought of without a secured obligation." Id. at 668 citing Carreras et al. v. Am. Colonial Bank, 35 P.R.R. 83, 87-88 (1926). In addition, "[t]his accessory nature explains the fact that the mortgage effectively subsists while the credit it secures is outstanding. When the credit is extinguished, the mortgage is extinguished; when the credit is transmitted, the mortgage is transmitted; the voidness or ineffectiveness of the credit causes the voidness or ineffectiveness of the mortgage. Id. at 668. Thus, a mortgage under Puerto Rico law is an accessory guarantee right which serves to secure a principal obligation. See Luis R. Rivera Rivera, Derecho Registral

<u>Inmobiliario Puertorriqueño</u>, pg. 484 (2000)[3]. Consequently, the principal obligation stems from a commercial loan that in turn is secured (guaranteed) by a mortgage which is an accessory right. A mortgage does not constitute an autonomous independent right.

The assignment of rents and leases in a mortgage deed stems from an accessory right, the mortgage, and this type of agreement is executed in the event that the borrower defaults on the principal obligation which is the commercial loan. The assignment of rents is an additional guarantee that the secured creditor has to enforce the payment of the principal obligation.

The Seventh Clause in the Deed of Mortgage between Debtor and Firstbank (the predecessor secured creditor), states the following;

> "[u]pon the occurrence of a default under this Mortgage, then at any time thereafter Mortgagee may, at its election;----
>> (a) proceed to foreclose the lien of this Mortgage as against all or any part of the Mortgaged Property (by summary proceedings or otherwise) and[d] to have the same sold under the judgment or decree of a court of competent jurisdiction; and/or----
>> (b) to the extent permitted by law, enter upon take possession of the Mortgaged Property or any part thereof by force, summary proceedings, ejectment or otherwise and may remove Mortgagors and all other persons and any and all properties therefrom, and may hold, operate and manage the same and receive all earnings, income, rents, issues, and proceeds accruing with respect thereto or any part thereof.----
>> ----In connection with any action brought to foreclose this Mortgage, Mortgagee shall, as matter of right, and without regard to the solvency of the Mortgagors or the adequacy of the security for the indebtedness from Mortgagors to Mortgagee, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Mortgagors hereby consents to the appointment of such receiver and will not oppose any such appointment" (Docket No. 35, Exhibit A-2).

---

[3] The following is a direct cite to the treatise: "La hipoteca no es ni puede ser un derecho autónomo, pues por su condición de derecho de garantía es requisito esencial e indispensable que se constituya para asegurar el cumplimiento de una obligación principal (art. 1756 del Código Civil). La hipoteca viene al servicio de un crédito y por ello no es concebible que pueda corresponder a persona distinta de la del crédito garantizado; es un pacto accesorio al principal que no constituye un derecho independiente con existencia propia. Su dependencia es de tal grado que si la obligación garantizada es nula, la hipoteca también lo será, y si la obligación es inexistente, tampoco existirá la hipoteca." <u>See</u> Luis R. Rivera Rivera, <u>Derecho Registral Inmobiliario Puertorriqueño</u>, pg. 484 (2000).

The Collateral Assignment of Lease Agreement and Rents executed by the Debtor and FirstBank states in pertinent part:

"Whereas, Assignee requires that the payment of the indebtedness evidenced by certain promissory notes (hereinafter the "Notes") in the principal amount of ELEVEN MILLION DOLLARS ($11,000,000.00), and an Interim Construction Loan Agreement in the principal amount of ONE MILLION DOLLARS ($1,000,000) (hereinafter the "Loan Agreements"), of even date, and authenticated under Affidavits Nos. 9096 and 9098 respectively, before Notary Public Nelson Biaggi García, be guaranteed among others, by the assignment to the Assignee of all rights, title, and interest, of Assignor in and to all the rents, issues and profits of and from the Property and in and to all leases now or hereafter existing, of all or any part of the Property. " (Docket No. 35-2, Exhibit A-2).

Paragraph one (1) of the Collateral Assignment of Lease Agreement and Rents provides;

"(1) Subject to the provisions of paragraph seven (7) hereunder, Assignor grants, transfers, and assigns irrevocably to Assignee, as collateral each and all lease contracts, hereinafter the Leases, with each of the tenants, and any future tenants of the Property, hereinafter the Tenants, which assignment includes all of Assignor's rights derived from the Leases (but none of the Assignor's obligations under the Leases, which obligations shall remain to be Assignor's obligations) with the express purpose that in the event that Assignor **defaults** in its obligations under the Note and the Construction Loan Agreement, Assignee shall receive, every month, each and all of the rental payments made by the Tenants including, but without limitation, all payments due by the Tenants for overages and for their respective participation in the maintenance costs, insurances, and property taxes, including but not limited to those accrued for the year 2003, but not yet paid until such time as such default is cured by Assignee." (*Emphasis ours*)(Docket No. 35-2, Exhibit A-2).

The language in the Collateral Assignment of Lease Agreement and Rents, provides an additional security to the principal obligation, which will be triggered in the event of a default by the Assignor regarding its obligations under the Note and the Construction Loan Agreement. The assignment of rents and leases originates from an accessory right, the mortgage note. This type of agreement is executed in the event that the borrower defaults on the principal obligation which is the construction loan agreement. The assignment of rents is an additional guarantee that the secured creditor has to enforce the payment of the principal obligation.

The significant and practical purpose of an assignment of leases and rents is to provide a mortgage lender the right to collect rents that accrue from the mortgaged real property for the period between the mortgagor's default and a completed foreclosure. See R. Wilson Freyermuth, *Modernizing Security in Rents: The New Uniform Assignment of Rents Act*, 71 Mo. L. Rev. 1, 5 (Winter 2006). An assignment of leases and rents is essential, particularly in states which permit only judicial foreclosure and the foreclosure process is lengthy, because it protects the mortgage lender from the "milking" of the rents. Id. The "milking" of the rents is the risk that the mortgage lender is exposed to when the foreclosure proceeding is pending and the debtor may collect the rents and spend them instead of the rents being applied to reduce the mortgage debt. Id.[4]

<u>Post-Petition Rent-Property of the Estate</u>

The threshold issue the court must first address is whether the post-petition rents are property of the estate under Puerto Rico Law; namely, how the property interests of lenders and borrowers in an assignment of rents is treated under Puerto Rico law.

To determine whether the post-petition rental income generated by the mall is property of the estate the court must analyze Puerto Rico law regarding the property interests of borrowers and lenders under the Collateral Assignment of Lease Agreements and Rents. If the post-petition rents are not property of the estate, the Debtor may not use them as they are property of CPG. However, if the post-petition rents are property of the bankruptcy estate, the court must then determine whether the Debtor is providing adequate protection to CPG pursuant to 11 U.S.C.

---

[4] For almost three decades there has been much litigation in the bankruptcy courts regarding the proper treatment and characterization of assignment of rents, which have been summarized by Professor R. Wilson Freyermuth as follows: (i) the proper scope of the term "rents;" (ii) when a security interest in rents has been properly "perfected;" (iii) whether a mortgagor can make an "absolute assignment of rents" as opposed to an assignment for additional security; and (iv) whether a security interest in rents creates an interest that is different from the mortgaged real property. See R. Wilson Freyermuth, *Modernizing Security in Rents: The New Uniform Assignment of Rents Act*, 71 Mo. L. Rev. 1, 8-9 (Winter 2006). These issues regarding the assignment of rents rely on state law because state law governs the creation and enforcement of security interests in rents. Id. at 7. The New Uniform Assignment of Rents Act by the National Conference of Commissioners on Uniform State Laws was drafted in the year 2005 to resolve these issues which are constantly being litigated.

§363(e) and (p). The Debtor does not contest that there is a pre-petition security interest on the rents and that the post-petition rents generated by the mall constitute CPG's cash collateral pursuant to 11 U.S.C. §363(a) and 552(b)(2) (Docket No. 76). This admission provides CPG with significant leverage in this bankruptcy proceeding by placing it in a position to question the Debtor's flexibility in spending the post-petition rents.

Discussion

When a bankruptcy petition is filed, an estate is created and is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a)(1). This statutory language evinces congressional intent to include a broad range of property. See City of Springfield v. Ostrander (In re LAN Tamers, Inc.), 329 F.3d 204 (1st Cir. 2003) citing United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05, 76 L. Ed. 2d 515, 103 S. Ct. 2309 (1983). Property of the estate also includes, "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. §541(a)(6).

A bankruptcy court must look to state law or other applicable non-bankruptcy law to determine whether a debtor has a pre-petition property interest in the rents. See Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest required a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding"). "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of §541." Wood v. Premiere Capital, Inc. (In re Wood), 291 B.R. 219, 224 (B.A.P. 1st Cir. 2003) citing In re Yonikus, 996 F. 2d 866, 869 (7th Cir. 1993). "The question of whether an interest claimed by the debtor is 'property of the estate' is a federal question to be decided by federal law; however, courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case." Id. at 224. Assignments of

-26-

rents are interests in real property and, as such are created and defined pursuant to state law. See Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979) ("The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property"). The Third Circuit in First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.), 59 F. 3d 423, 427 (3rd Cir. 1995) stated, "[a] federal court in bankruptcy is not allowed to upend the property law of the state in which it sits, for to do so would encourage forum shopping and allow a party to receive a 'windfall merely by reason of the happenstance of bankruptcy.' Butner, 440 U.S. at 55, 99 S. Ct. at 918. Thus, in determining whether the parties' assignment of rents transferred title or, instead, created a 'security interest,' our goal must be to ensure that [the lender] 'is afforded in federal bankruptcy court the same protection [it] would have under state law if no bankruptcy had ensued. Id. at 56, 99 S. Ct. 1t 918."

In the instant case, CPG argues that it acquired ownership rights over the rents generated by the mall based upon the "Collateral Assignment of Lease Assignments and Rents." The Collateral Assignment of Lease Assignments and Rents is in turn governed by Articles 1416 *et seq*. of the PR Code, 31 L.P.R.A. §3941 *et seq*.

Builders Group argues that its interest in the rents can only be extinguished by a foreclosure of the rent producing collateral and cites cases from different jurisdictions which support this conclusion. Builders Group also cites In re South Side House, LLC, 474 B.R. 391 (Bankr. E.D.N.Y. 2012), a case based upon New York law and which distinguishes between two different concepts: the right to collect rents and having ownership of the rents. In re South Side House, LLC, 474 B.R. 391, the court stated that; "…the right to collect rents is not the same as having title to them. Under New York law, the right to enforce an assignment or collect the rents does not confer title. As courts have noted: '[a] mortgagee with a rent assignment has an equitable right to collect, but does not have legal title to rents automatically upon default. Rent is an incident of title which in New York remains in the mortgagor after default and which cannot

be conveyed by a rent assignment clause in a mortgage prior to a foreclosure'" In re South Side House, LLC, 474 B.R. at 404 citing In re Cerrico Realty Corp., 127 B.R. 319, 323 (Bankr. E.D.N.Y. 1991) (quoting Ryen v. Park Hope Nursing Home, Inc. (In re Flower City Nursing Home, Inc.), 38 B.R. 642, 645 (Bankr. W.D.N.Y. 1984)).

A law review article titled, *Absolutely Not! The Ability of a Lender to Extinguish a Debtor's Interest in Rents Under an Absolute Assignment*, discusses how courts have taken different approaches in their analysis of "absolute" assignment of rents that stem from commercial transactions in which the loan is secured by a first mortgage with a rent assignment pledge on the borrower's only asset; namely a shopping center. The article notes that;

> "[t]he troubling aspect of these cases is their failure to discuss or analyze relevant state law, despite the fact that they uniformly begin their analysis with a reference to the dictates of *Butner*. These cases have pinned their rulings on a determination that once a creditor has taken the 'enforcement' steps required under the rent assignment or state law that entitle the creditor to collect the rents, the debtor's ownership of the rents is extinguished. However, the decisions fail to analyze whether the right to *collect rents* is equal with *ownership of rents* under state law." John R. Clemency and John A. Harris, *Absolutely Not! The Ability of a Lender to Extinguish a Debtor's Interest in Rents Under an Absolute Assignment*, 13-8 ABIJ 20 (1994).

Builders Group argues that the controlling law is 11 U.S.C. §541(a)(6), which preempts state law and makes inapplicable the United States Supreme Court decision in Butner v. U.S., 440 U.S. 48 (1979). Builders Group bases its argument on the case of In re Amaravathi Ltd. Partnership, 416 B.R. 618 (Bankr. S.D. Tex. 2009), in which the court held that the post-petition rents were property of the estate because Section 541(a)(6) governed the outcome of the case since it mandates that rents generated from property of the estate be included within the bankruptcy estate. In In re Amaravathi Ltd. Partnership, the bankruptcy court determined that in enacting Section 541(a)(6), Congress decided to supersede state law so that debtors could use post-petition rents to operate and reorganize. See In re Amavarathi Ltd. Partnership, 416 B.R. at 624-625.

This court does not agree with the Debtor's analysis of the holding in In re Amaravathi Ltd. Partnership for the following reasons: (i) Section 541 is not intended to expand a debtor's rights beyond those that exist pursuant to state law. See Paul Rubin, *Absolute Assignments of Rents Survive Filings*, 30-1 ABIJ 50 (February 2011). The House of Representatives and Senate reports provide that Section 541, "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case." Moody v. Amoco Oil Co., 734 F. 2d 1200, 1213 (7th Cir. 1984) (quoting House Report, H.R., Rep. No. 595, 95th Cong., 1st Sess. reprinted in 1978 U.S. Code Cong. & Ad. News 5787); Drewes v. Vote (In re Vote), 276 F. 3d 1024, 1026 (8th Cir. 2002) (quoting Senate Report, S. Rep. No. 95-989. at 82 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5868); and (ii) "[t]here is a strong presumption against inferring congressional pre-emption of state law property rights in the bankruptcy context. When Congress intends to displace state nonbankruptcy law it has done so clearly and explicitly, using the phrase 'notwithstanding any other applicable non-bankruptcy law' or similar language, which appears in other Code provisions, such as §§1123(a), 541(c)(1), 728(b) and 363(1). Neither the legislative history nor the text of §541 reflects an intent to preempt state law property rights in rents absolutely assigned pre-petition." Paul Rubin, *Absolute Assignments of Rents Survive Filings*, 30-1 ABIJ 50 (February 2011).

The court does agree that the Bankruptcy Reform Act of 1994 added section 552(b)(2) to have rents treated as cash collateral notwithstanding the lender's pre-petition failure to seek enforcement of its security interests. See In re National Promoters & Services., 2013 Bankr. Lexis 3766, *39, fn. 11 (Bankr. D. P.R. 2013).

State law determines whether the Debtor or CPG owns the rents. Therefore, the court proceeds to analyze the interface of applicable law in Puerto Rico and the Bankruptcy Code.

*Assignments under the Civil Code of Puerto Rico*

This court in the case of In re National Promoters & Services.,Inc., established the following about the nature of rents under the Civil Code of Puerto Rico;

-29-

"Article 260 of the Civil Code of Puerto Rico distinguishes properties between movables and immovables. 31 L.P.R.A. § 1029. "Immovables are, in general, those which cannot move themselves or be removed from one place to another." Article 261 of the Civil Code, 31 L.P.R.A. § 1041. "Things may be immovable either by their own nature or by their destination or the object to which they are applicable." Article 262 of the Civil Code, 31 L.P.R.A. § 1042. Immovable properties include "[l]ands, buildings, roads and structures of every kind adherent to the soil." Article 263(a) of the Civil Code, 31 L.P.R.A. § 1043(a). Incorporeal objects can also be considered immovable from the object to which they apply. See Article 264 of the Civil Code, 31 L.P.R.A. § 1044. Rights and obligations established on an immovable object are also considered immovable. Article 264(b) of the Civil Code, 31 L.P.R.A. § 1044(2).

Rents are defined as the proceeds from a lease agreement. See e.g. Vélez v. San Miguel, 68 P.R.R. 535, 549, 68 D.P.R. 575, 591 (1948) (Dissenting Opinion by Justice Todd); Black's Law Dictionary, 9th ed., West, 2009, p. 1141 (defining "rent" as the payment "for the use of another's property"). Rents are typically considered movable properties except when they constitute a lien on a real property or mortgage loans. Article 269 of the Civil Code, 31 L.P.R.A. § 1065. Similarly, "[t]he ownership of property, whether movable or immovable, carries with it the right, by accession, to everything which is produced thereby, or which is united thereto or incorporated therewith, either naturally or artificially." Article 287 of the Civil Code, 31 L.P.R.A. § 1131. Ownership of a property also entitles ownership over its "civil fruits". Article 288(3) of the Civil Code, 31 L.P.R.A. § 1141(3). "Civil fruits are the rents of buildings, the price paid for the lease of lands, and the amount of perpetual, life or other similar incomes." Article 289 of the Civil Code, 31 L.P.R.A. § 1142." In re National Promoters & Services., 2013 Bankr. Lexis 3766, *16-18 (Bankr. D. P.R. 2013), 2013 WL 4829162 (Bankr. D. P.R. 2013).

Article 1065 of the Civil Code of Puerto Rico provides that; "[a]ll the rights acquired by virtue of an obligation are transmissible, subject to law, should there be no stipulation to the contrary." 31 L.P.RA. §3029. Article 1065 includes all sorts of rights of credits. Consejo de Titulares v. C.R.U.V., 132 D.P.R. 707, 718 (1993). There are four (4) requirements for a transfer of a credit to be valid: (1) the credit must be transmittable; (2) it must be grounded on a valid title; (3) the credit must be existent; and (4) it must be originating from an efficient obligation. Id. at 718, quoting IBEC v. Banco Comercial, 117 P.R. Off. Trans. 446, 453-454, 117 D.P.R. 371, 377 (1986). Rents owed to a lessor may constitute a transmittable credit.

The Civil Code of Puerto Rico does not expressly define "assignments," but rather provides the effects they have over the contracting parties and third parties. See José R. Vélez Torres, Derecho de Obligaciones, Interamerican University School of Law, 2nd ed., 1997, p. 251; In re National Promoters & Servs., 2013 Bankr. Lexis 3766, *26 (Bankr. D. P.R. 2013).  Article 1416 of the Civil Code of Puerto Rico provides; "[t]he assignment of a credit, right, or action shall produce no effect against a third person but from the time the date is considered fixed, in accordance with sections 3273 and 3282 of this title. If said assignment involves real property, from the date of its entry in the registry" 31 L.P.R.A. §3941.

Spanish commentator Espín explains, "that the voluntary assignment of credit requires consideration ("causa") that serves as the basis for the juridical business by which the conventional assignment is realized (executed). The consideration may consist in a gratuitous title (such as a donation given by the mere liberality of the benefactor), a valuable consideration (such as a purchase-sale, an in kind exchange ("permuta")) or the consideration may consist in extinguishing another debt by providing payment with the assigned credit." Diego Espín, Manual de Derecho Civil Español, 228, Vol. III. Madrid, Ed. Revista de Derecho Privado (4th ed. 1975).[5]

The Supreme Court of Puerto Rico has defined "cesión de crédito," or assignment of credit, as "a legal business executed by the assignor with another person, the assignee, by virtue of which the former transfers the latter the ownership of the right of the assigned credit."  IBEC v. Banco Comercial, 117 P.R. Off. Trans. 446, 453, 117 D.P.R. 371, 376 (1986) citing I L. Díez-

---

[5] "La cesión voluntaria representa respecto a la obligación, lo mismo que la *traditio* para los derechos reales, y al igual que ésta, requiere una causa que sirva de fundamento al negocio jurídico, por virtud del cual se realiza la cesión convencional. Esta causa puede ser tanto un acto a título gratuito (donación) como a título oneroso (compraventa, permuta), como igualmente puede servir para extinguir otra deuda dando en pago de ésta el crédito cedido" Diego Espín, Manual de Derecho Civil Español, 228 Vol. II. Madrid, Ed. Revista de Derecho Privado (4th ed. 1975).

Picazo, Fundamentos del Derecho Civil Patrimonial 789, Madrid, Ed. Tecnos (1979) and also as: "that operation whereby a third person, substituting the creditor, comes into the possession of an obligation that, nonetheless remains the same." Id. citing III F. Puig Peña, Compendio de Derecho Civil Español 242-243, Madrid, Ed. Pirámide (3d ed. 1976)[6]; See also, IV-I J.R. Vélez Torres, Curso de Derecho Civil –Derecho de Obligaciones 229, San Juan (1981); and III-1 E. Vázquez Bote, Derecho Civil de Puerto Rico 319, San Juan Eds. Jurídicas (1973).

Commentator Puig Peña further explains, that from this definition of assignment of credit the following characteristics are derived: (a) the creditor, that relinquishes the title, is absolutely eliminated from the obligation (b) the new creditor assumes the obligation in the same position of the old (original) creditor and with the same conditions as the old (original) creditor. (c) notwithstanding the transposition of creditors, the obligation remains the same. As a consequence, the following results: (1) the credit guarantees in favor of the new creditor continue to exist. Article 1528 [Article 1418 of the PR Code], "[t]he sale or assignment of a credit includes that of all the accessory rights, such as the security, mortgage, pledge, or privilege." The new creditor is also entitled to the interests, fruits, torts and expenses which constitute part of the credit; (2) the debtor of the obligation can present to the new creditor the same exceptions that it could present to the original creditor because the situation of the debtor may not worsen as a result of the assignment. Id. at 243-244. [7]

---

[6] "Se entiende por cesión de créditos <<aquella operación en virtud de la cual un tercero, sustituyendo al acreedor, se convierte en el titular activo de una obligación que, no obstante, permanece la misma>>" III F. Puig Peña, Compendio de Derecho Civil Español 242-243, Madrid. Ed. Pirámide (3d. ed. 1976).

[7] "De esta definición se deducen los caracteres siguientes:
    (a) El acreedor, al conceder el título, queda eliminado absolutamente de la obligación. Claro está que esto ha de entenderse desde el momento en que la cesión ha quedado articulada en la persona del deudor, pues hasta tanto, el acreedor primitivo sigue siendo en principio el titular del crédito, si bien tendrá que responder frente al cesionario de la cesión realizada.
    (b) El nuevo acreedor entra en la obligación en el mismo lugar y condiciones en que se hallaba el antiguo.

"The assignee holds the same position and binding relationship with regard to the debtor from the moment the credit is transferred. It is a transfer of credit made by the creditor or assignor to the assignee through an *inter vivos* act which accomplishes an economic function of great importance and utility in modern economics." IBEC v. Banco Comercial, 117 P.R. Off. Trans. 446, 453, 117 D.P.R. 371, 376 (1986) citing I L. Díez-Picazo, Fundamentos del Derecho Civil Patrimonial 789, Madrid, Ed. Tecnos (1979).

Puig Peña discusses the composition of the assignment as a juridical figure in terms of two (2) relationships: (1) the relationship between the assignor and the assignee and (2) the relationship between the assignee and the debtor. In the relationship between the assignee and the assignor the following results: (a) the assignor transfers to the assignee the right to collect the nominal amount of a credit, even if the same has been paid at a lower price; (b) the assignor is obliged not to execute any act contrary to what has been agreed to; (c) the assignor must transmit to the assignee all of the accessory rights, such as the security, mortgage, pledge, or privilege, including all the privileges which are not purely personal in nature; and (d) the assignor must

---

(c) No obstante la transposición de acreedores, la obligación permanece la misma. En consecuencia:
(a)' Subsisten en favor del nuevo acreedor (y en esto se diferencia de la cesión del crédito de la novación subjetiva por cambio de la persona del acreedor) todas las garantías de su crédito, así como las acciones del mismo. Según nuestro art. 1.528 [Art. 1418 Código Civil de Puerto Rico], "la venta o cesión de un crédito comprende la de todos los derechos accesorios, como la fianza, la hipoteca, prenda o privilegio." III F. Puig Peña, Compendio de Derecho Civil Español 243, Madrid. Ed. Pirámide (3d. ed. 1976).

"En principio, corresponden también al nuevo acreedor las pretensiones de intereses, frutos, provechos, daños y gastos; pues, como dice Ennecerus, desde el punto de vista económico, constituyen un todo con el crédito, si bien por lo que respecta a los intereses vencidos, parece que no deben transferirse con el mismo.

(b)' El deudor de la obligación puede oponer al nuevo acreedor las excepciones que podría oponer al acreedor ordinario. Esto es consecuencia del principio de que la situación del deudor no puede empeorarse por virtud de la cesión." III F. Puig Peña, Compendio de Derecho Civil Español 243-244, Madrid. Ed. Pirámide (3d. ed. 1976).

provide to the assignee a guarantee obligation. See III F. Puig Peña, Compendio de Derecho Civil Español 247, Madrid, Ed. Pirámide (3d ed. 1976).[8]

In the instant case, CPG argues that its assignment of rents originates from the "Collateral Assignment of Lease Agreement and Rents" executed on May 18, 2004 between Builders Group and FirstBank, the predecessor creditor. CPG contends that in conformity with Article 1416 of the PR Code and the corresponding case law, the Assignment became binding, valid, and opposable against third parties on May 18, 2004 and "…CPG/GS, as the substitute of FBPR [FirstBank Puerto Rico], would have acquired unconditional title over the Rents as of May 18, 2004" (Docket No. 91, pg. 17, paragraphs 49 & 50). CPG alleges that the Assignment provides that the secured creditor's ownership over the rents was conditioned upon "the event [that Debtor] defaults its obligations under [the Loans]" and that pursuant to the Assignment, "…the secured creditor's title over the [r]ents was predicated upon the occurrence of a particular condition precedent ('condición suspensiva'), i.e. Debtor's default under the Loans" (Docket No. 91, pgs. 17-18, paragraph 51). Thus, CPG concludes that once the creditor proves the existence and date of the default, the assignment becomes fully enforceable under the Civil Code of Puerto Rico (Docket No. 91, pg. 18, paragraph 54). CPG states that a default occurred under the Loans and the Loan Documents as of August 24, 2010, date in which the Forbearance Agreement was

---

[8] "Al estudiar el contenido de esta figura, debemos hacernos cargo de las dos clases de relaciones siguientes:
  (a) Relación cesionario-cedente.- En la relación entre el cesionario y el cedente se producen los siguientes efectos:
    1. El cedente transmite al cesionario el derecho a cobrar el importe nominal del crédito, aunque éste haya pagado aquél un precio inferior a dicho importe;
    2. El cedente queda obligado a no ejecutar acto alguna que se oponga a que lo convenido alcance sus naturales efectos (sentencia de 7 de junio de 1941);
    3. El cedente debe transmitir al cesionario todos los derechos accesorios de crédito (fianza, hipoteca, prenda), así como los privilegios que no sean de matiz puramente personal (art. 1.528);
    4. El cedente, por último, debe prestar, respecto al cesionario, la llamada obligación de garantía o saneamiento." III F. Puig Peña, Compendio de Derecho Civil Español 247, Madrid, Ed. Pirámide (3d. ed. 1976).

executed through an affidavit before a Notary Public, and thus, "…it is uncontested that CPG/GS acquired full and unconditional title over the [r]ents generated by the Shopping Center as early as August 24, 2010" (Docket No. 91, pg. 19, paragraph 57). CPG/GS further states that it sent the [f]oreclosure letters to certain of Debtor's tenants on or about April 7, 2011, instructing such tenants to pay the rents directly to CPG/GS, as authorized by the Puerto Rico Civil Code, the Assignment and the Forbearance Agreement (Docket No. 91, pg. 19, paragraph 58).

This court concludes that in the instant case, the Collateral Assignment of Lease Agreement and Rents does not transfer title (ownership) of the rent pursuant to Articles 1416-1427 of the PR Code, 31 L.P.R.A. §3941-3961, the limited state case law available and the explanations of this juridical figure by various commentators. CPG's right to collect the rental revenues from the mall was an accessory right derived from the principal obligation of the Debtor, the payment of a commercial loan, which was additionally secured by a promissory mortgage note and mortgage deed.[9] If the Debtor defaulted on its principal obligation, then its

---

[9] The third "Whereas" of the Collateral Assignment of Lease Agreement and Rents" provides the following;

"**Whereas, Assignee** requires that the payment of the indebtedness evidenced by certain promissory notes (hereinafter the **'Notes'**) in the principal amount of **Eleven Million Dollars** ($11,000,000.00), and an Interim Construction Loan Agreement in the principal amount of One Million Dollars ($1,000,000.00)(hereinafter the 'Loan Agreements'), of even date, and authenticated under Affidavits Nos. **9096** and **9098** respectively, before Notary Public Nelson Biaggi García, be guaranteed, among others, by the assignment to the **Assignee** of all rights, title, and interest, of **Assignor** in and to all the rents, issues and profits of and from the **Property** and in and to all leases now or hereafter existing, of all or any part of the **Property**;

**Now Therefore**, in consideration of the foregoing, and of the mutual and separate agreements, covenants, and warranties of the parties hereto, and for other good and valuable considerations:

(1) Subject to the provisions of paragraph seven (7) hereunder, **Assignor** grants, transfers, and assigns irrevocably to **Assignee**, as collateral each and all lease contracts, hereinafter the **Leases**, with each of the tenants, and any future tenants of the Property, hereinafter the **Tenants**, which assignment includes all of **Assignor's** rights derived from the Leases (but none of the **Assignor's** obligations under the **Leases**, which obligations shall remain to be **Assignor's** obligations) with the express purpose that in the event Assignor defaults its obligations under the Note and in the Construction Loan Agreement, **Assignee** shall receive, every month, each and all of the rental payments made by the Tenants including, but without limitation, all payments due by the Tenants for overages and for their respective participation in the maintenance costs, insurances, and property taxes, including but not limited to

-35-

secured creditor could collect all of the rental payments made by the tenants as additional collateral (security). Accessory rights may not be assigned unless the principal obligation (or right) is also assigned. Manuel Albaladejo and Silvia Díaz Alabart, <u>Comentarios al Código Civil y Compilaciones Forales</u>, Tomo. XIX, 697-698, Madrid, Ed. Revista de Derecho Privada (2nd. ed.1991).

The obligations of Debtor under the "Collateral Assignment of Lease Agreement and Rents" do not meet the elements that the juridical figure of assignment of credit is supposed to encompass. Builders Group has not relinquished its title to the lease agreements and the rents through the assignment, and is not "absolutely eliminated from the obligation" because Builders Group is still obliged as the Assignor (Lessor) to the obligations under the lease agreements. CPG is not assuming the obligations under the lease agreements with and under the same conditions as Builders Group. The assignment of credit by Builders Group is in effect an additional security which originates from the loan documents and the corresponding mortgage notes and mortgage deeds provided by Builders Group to the secured creditor. The security agreement (namely the "Collateral Assignment of Lease Agreement and Rents") that was executed by Builders Group and secured creditor (FirstBank) was an additional security to the commercial loan which was secured by a promissory mortgage note and two (2) mortgage deeds and that the same extends to post-petition rents pursuant to 11 U.S.C. §552(b)(2).

Therefore, the rents constitute property of the estate since the ownership rights (title) of the rents were not transferred to the secured creditor. The rents do constitute cash collateral in favor of CPG.

---

those accrued for the year 2003, but not yet paid until such time as such default is cured by Assignee." (Docket No. 35, Exhibit A-2).

-36-

*Use of Cash Collateral & Adequate Protection*

Builders Group accepts that CPG holds an 11 U.S.C. §552(b)(2) security interest in the post-petition rents and that the rents constitute CPG's cash collateral. The court agrees with the Debtor's position following the rationale in In re National Promoters & Services, Inc. The only issue is whether Builders Group has offered CPG adequate protection for the real estate and for the use of the rents.

In In re National Promoters & Services, Inc., this court stated the following regarding the applicable law regarding cash collateral:

"Section 363(c) of the Bankruptcy Code prohibits the debtor to "use, sell, or lease cash collateral" in the ordinary course of business, unless the secured creditor consents or the court authorizes it. 11 U.S.C. § 363(c)(2). Under Section 363(b), a debtor may use cash collateral other than in the ordinary course of business, subject to objection by the secured creditor under Section 363(e). Section 363(e) provides that when a creditor objects to a debtor's use of its cash collateral, the bankruptcy court "shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

"It is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected." In re South Side House, LLC, 474 B.R. at 408. When considering adequate protection for the use of rents, courts have recognized that Section 552(b) creates a security interest in post-petition rental income that is separate and distinct from the creditor's security interest in the property securing the mortgage. See In re Gramercy Twins Assocs., 187 B.R. 112, 121 (Bankr. S.D.N.Y. 1995).

Adequate protection may be provided by cash payments or additional or replacement liens "to the extent" the debtor's use of the property "results in a decrease of value of such entity's interest in such property". 11 U.S.C. § 361(1). A secured creditor "is entitled to adequate protection of two distinct interests: its mortgage on the property and its right to collect the rents flowing from the property or, at the very least, its security interest in such rents." Financial Center Assoc. v. TNE Funding Corp., 140 B.R. 829, 834 (Bankr. E.D.N.Y. 1992)." In re National Promoters & Services., 2013 Bankr. Lexis 3766, *42-44 (Bankr. D. P.R. 2013).

Moreover, "[w]here [] there is a specific assignment of rents given as security, a diversion of any portion of the rents to a party other than the secured party is clearly a

-37-

diminution of the secured party's interest in the assignment of rents portion of the security. To protect against that diminution in value, a debtor must provide adequate protection for the interest in rents above and beyond any adequate protection for the interest in the real property…Any such decrease attributable to the [d]ebtor's usage, therefore, must be protected by cash payments from another source, an additional or replacement lien, or other such indubitable equivalent" In re Smithville Crossing, LLC, 2011 Bankr. Lexis 4605, *29 (Bankr. E.D.N.C. 2011) citing In re Griswold Building, LLC, 420 B.R. 666, 699 (Bankr. E.D. Mich. 2009); See also; Travelers Ins. Co. v. River Oaks Ltd. Partnership (In re River Oaks Ltd. Partnership), 166 B.R. 94, 99 (E.D. Mich. 1994); In re Buttermilk Towne Ctr., LLC, 442 B.R. 558, 566 (B.A.P. 6th Cir. 2010).

In addition, the fact that rental income is utilized to pay the operating expenses of the shopping center by itself does not provide the adequate protection required under 11 U.S.C. §363 for the security interest regarding the assignment of rents. See In re River Oaks Ltd. Partnership, 166 B.R. at 99 ("The Court does not believe the mere fact that the rental income is used to pay the necessary expenses of operating and maintaining the property or that the property is adequately maintained and not depreciating, in and of itself, provides the adequate protection required under §363 for the security interest covered by the assignment of rents.").

In the instant case, CPG holds both a mortgage on the real property and a security interest in the post-petition rents. Builders Group has offered adequate protection for the mortgage on the shopping center which consists in a monthly payment of $22,191.45 which is based on a 3.05% annual interest rate of CPG's secured portion of its claim, which both parties have agreed for this particular issue of cash collateral amounts to $8,731,063. However, Builders Group has not provided adequate protection for CPG's security interest in the post-

-38-

petition rents which must be adequately protected in their own right. The burden of proof is on the debtor to demonstrate that the creditor is adequately protected for purposes of using its cash collateral. 11 U.S.C. §363(p)(1).

Builders Group's amended cash flow projections reflect that the revenues from the Cupey Professional Mall for the following months are as follows: (i) $102,619 for the month of July; (ii) $649,451 for the month of August; and (iii) $114,552 for the month of September (Docket No. 72-1, pg.1). The rental revenue for the month of August includes the estimated $400,000 in renewal fees from a tenant (Wendy's) and $150,000.00 from a settlement expected to be received from another tenant, Cupey Bowling. The projected expenses for these three (3) months are the following: (i) $58,275 for the month of July; (ii) $51,538 for the month of August; and (iii) $56,138 for the month of September (Docket No. 72-1, p.1). The common area management expenses for these months, which include all the expense listed except the administrative expense portion, consist of the following: (i) $37,327 for the month of July; (ii) $33,698 for the month of August; and (iii) $34,298 for the month of September (Docket No. 72-1 pgs. 7 &8). Note 12 of the amended projections stated that, "[t]he projections are based on actual collections (estimated by Debtor) by adjusting the total rent roll for items not collected normally, or contracts commencing in September or subsequently." (Docket No. 72-1, pg. 5). The detail regarding the cash inflows for the monthly projections for these months (July, August and September) all include a line item for prepetition account receivable in the amount of $20,000 (Docket No. 72-1, pg. 6). Note 9- Rent Receivable of the Amended Preliminary Cash Flow Projections states that; "[r]ent receivable and rent collections had to be investigated by Debtor and are based on the information provided by tenants. CPG Servicing has not provided Debtor, despite multiple requests, a complete historical record of payments by tenants and other

collection." (Docket No. 72-1, pg. 4). The estimated revenues for rents which includes the base rent, electricity charges, CAM and taxes charge for the months of July, August and September are the following: (i) $82,443 for the month of July; (ii) $79,275 for the month of August; and (iii) $94,378 for the month of September (Docket No. 72-1, pg. 6). The actual rental income for the month of July was in the amount of $21,542.79 (Docket No. 85-1, pg. 1). The actual rental income for August 1-7 was in the amount of $77,164.24 and included the amount of $46,672.56 which was deposited by CPG in court. The expected total rental income for the month of August is in the amount of $126,119.70 and includes $48,955.46 which listed as expected payments to be received directly by Builders Group. However, there is no explanation as to the source of these funds which are expected to be received by the Debtor. Thus, the actual rental income for the months of July and August was in the amount of $98,707.03, not including the expected payment of $48,955.46 which is expected to be received by Builders and for which there is no explanation as to the source for this payment.

This court finds that the actual revenues generated in the months of July and August ($98,707.03) are not sufficient to cover CPG's adequate protection for the real estate property (the monthly payment of $22,191.45) and for the estimated common area management expenses corresponding to these months, not including the administrative expenses, which amount to $37,327 for the month of July and $33,698 for the month of August. Moreover, the court finds that at the August 26, 2013 hearing, CPA Monge did not have conclusive information as to whether the three (3) tenants that were supposed to begin their leases in the month of September had signed the same and provided a security deposit. However, according to Note 12 of the amended preliminary cash flow projections, the companies starting in September would pay $10,892 for base rent, $2,178 for electricity and $2,859 for CAM-taxes which amounts to a

-40-

monthly payment of $15,929. The court finds that these amended cash flow projections are not supported by the average rental income that CPG has received from the tenants for the past two (2) years which averages in the range of $35,000- $40,000. Moreover, as of the hearing date, one of the shopping center's anchor tenants (Wendy's) had not renewed its lease and it is from the renewal fee of $400,000 from which the Debtor will fund the repairs and maintenance of the shopping center. Note 7 of the Amended Preliminary Cash Flow Projections regarding the renewal fees states that: "[t]he cash flow includes renewal fees that are being negotiated with Wendy's since the original twenty year contract elapsed. The estimated renewal fee is expected to be $400,000." (Docket No. 72-1, pg. 3). There is no information as to the date the lease with Wendy's expired.

The court finds that the Debtor has not satisfied its burden under 11 U.S.C. §363(p)(1) to prove that CPG is being adequately protected for both its mortgage on the real property and its security interest in the post-petition rents. The evidence before the court shows that the actual rental income received in the past months and for the past two (2) years is not sufficient to cover the operating expenses (exclusive of the administrative expenses) and to provide adequate protection of the real estate property given as collateral to CPG. This is without taking into account the adequate protection that the Debtor would have to provide CPG for the use of the post-petition rents.

### Conclusion

In view of the foregoing, the court finds that the rents constitute property of the estate under state law and that the same constitute cash collateral to CPG's debt. However, the court also finds that the Debtor has not provided adequate protection to CPG for its two separate

interests; namely, its mortgage on the real property and its security interest in the post-petition rents. Thus, Builders Group may not use CPG's cash collateral (the post-petition rents).

SO ORDERED.

In San Juan, Puerto Rico, this 22nd day of October, 2013.

Enrique S. Lamoutte
United States Bankruptcy Judge

-42-