## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | Case No. 13-04867 (ESL) |
| BUILDERS GROUP & DEVELOPMENT CORP., | Chapter 11 |
| Debtor(s). | |

## **OPINION AND ORDER**

CPG/GS PR NPL, LLC ("CPG/GS" or "Secured Creditor"), secured and judgment creditor, moved on November 7, 2013 (Dkt. No. 121, or Motion to Convert" ) to convert to chapter 7, the chapter 11 case of the debtor Builders Group & Development Corp. ("Debtor") for cause pursuant to 11 U.S.C. §1112(B)(4)(A) and (B). Cupey Bowling & Entertainment Center Corp., one of Debtor's major tenants, joined the Motion to Convert on November 13, 2013 (Dkt. No. 127). An evidentiary hearing on the Motion to Convert was held on December 3, 2013 and January 10, 2014.

CPG/GS' Exhibits 1-24 and Debtor's Exhibits A-M were admitted in evidence by stipulation. CPG/GS presented as witnesses Messrs. Hector Del Rio, Rafael Bonin, Franco Gonzalez, Jorge Rios Pulpeiro, and CPA Jose Monge Robertin, designating their testimonies of November 18, 2018 in the hearing upon CPG/GS' motion for relief from stay, admitted by stipulation as evidence upon the Motion to Convert.[1] Mr. Carlos Otero testified for Debtor on December 3, 2013, and Mr. Jorge Rios-Pulpeiro testified for Debtor on January 10, 2014. The Court entered a bench order converting the case to chapter 7 for cause under 11 U.S.C. §1112(B)(4)(B) and (I), deferring written opinion until completion of transcript. See Minutes of January 10, 2014 (Dkt. No. 197).

The following consitute the Court's findings of fact and conclusions of law upon the order to convert of January 10, 2014 as modified January 27, 2014 (Dkt. Nos. 197, 202).

---

[1] Minutes, Dkt. 193 at 1; Pre-Trial Report (Dkt. 158 at 11); Dkts. 135, 136.

00139541; 1

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b) (1) and (b) (2) (A). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

## FINDINGS OF FACT

1. Builders Group & Development Corp. (the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Code") on June 12, 2013 (the "Petition Date").

2. Prior to the Petition Date, the Debtor entered into various loan agreements with FirstBank (CPG/GS is the successor creditor) pursuant to which FirstBank as the predecessor creditor provided certain credit facilities to the Debtor which are evidenced by the loan documents.

3. The loans are secured by, among other things, certain real property that is described in the mortgage deeds. The real estate collateral is the Cupey Professional Mall (the "Shopping Center").

4. The Debtor generated rental income from the Shopping Center, which was pledged to CPG/GS.

5. As part of the loan documents and collateral for the loans, on May 18, 2004, the Debtor granted CPG/GS a pre-petition "Collateral Assignment of Lease Agreements and Rents" as attested though an affidavit issued by a Notary Public, which provided a lien in favor of CPG/GS over the rents generated by the Shopping Center.

6. Prior to the Petition Date, Debtor defaulted on its obligations under the loan documents, which defaults were duly notified to the Debtor.

7. Debtor admitted these defaults by and through the Forbearance Agreement executed on August 24, 2010, which was attested through an affidavit before a Notary.

8. On or about April 7, 2011, as a result of such defaults, CPG sent letters to certain of the Shopping Center tenants, as authorized by the "Collateral Assignment of Lease Agreements and Rents" and the Forbearance Agreement, instructing such tenants to remit payments directing to CPG/GS.

9. As a result of the Debtor's defaults CPG/GS commenced a civil action for foreclosure of mortgages and collection of money on August 16, 2011 in the Puerto Rico Court of First Instance, San Juan Section, Civil Num. K CD2011-1828.

10. Prior to the Petition Date, CPG/GS obtained a judgment in the state court case. The Judgment was upheld in the Puerto Rico Court of Appeals as well as the Supreme Court of Puerto Rico.

11. On August 26, 2013, CPG/GS filed Proof of Claim No. 11 in the amount of $23,057,297.28, including its secured portion of $8,731,063.00.

12. On August 21, 2013, Debtor filed budgets detailing the actual revenue received during the months of June, July and August 2013. See, Docket No. 85. This Court has found that "the actual rental income received in the past months and for the past two years is not sufficient to cover the operating expenses (exclusive of the administrative expenses) and to provide adequate protection of the real estate property given as collateral to CPG". Exh 15 at p. 41.

13. On October 25, 2013, CPG/GS requested relief from the automatic stay ( "Motion to Lift Stay, or "MLS") for cause under Bankruptcy Code (the "Code") Section 362(d)(1), and also for lack of equity and no reasonable reorganization prospects under Code Section 362(d)(2), to permit enforcement of all its rights and security interests, including among others, foreclosure and direct collection and application of rents from the Shopping Center (Dkt. No. 111). In the MLS, CPG/GS alleged, among others, that since the Petition Date: Debtor grossly mismanaged the Shopping Center; the value of the Shopping Center has materially diminished; and senior property tax liens

have increased by more than $87,000 because of additional accrual of property taxes on or about September 30, 2013. The Debtor filed its opposition on November 12, 2013 (Dkt. 125). An evidentiary hearing was held on November 18, 2013. On November 27, 2013 this court entered an Opinion and Order (Dkt. No. 150, or "MLS Opinion", admitted in evidence in this contested matter as Trial Exhibit 23) granting relief from stay under each of 11 U.S.C. §362(d) (1) and (d) (2). In the MLS Opinion, the Court found, among other facts, that Debtor had failed to provide any adequate protection for CPG's security interest in post-petition rents (MLS Opinion at 9), and the post-hearing offer of $6,600 for adequate protection of post-petition rents (Dkt. No. 142, November 22, 2013) was still insufficient under the circumstances. (MLS Opinion at 9-10). In the MLS Opinion, the Court found also that as admitted by Debtor, there was no equity in CPG's collateral (MLS Opinion at 10); and further, that Debtor had not sustained its burden to show a "reasonable possibility of a successful reorganization within a reasonable time." MLS Opinion at 11.

15. Builders Group included CPG in its Schedule D-Creditors Holding Secured Claims-as a secured creditor of two (2) mortgage loans from 08/10/2011, which amount to $9,400,000.00. The Debtor listed the value of the property subject to the mortgage lien in the amount of $11,900,000.

16. CPG filed Claim No. 11 on August 26, 2013, in the amount of $23,057,297.28, including its secured portion of $8,731,063.00 (the remaining $14,326,34.28 are listed as unsecured). Exhibit 4.

17. On October 23, 2013, this court entered an Opinion and Order (Exhibit 15, Dkt. No. 108) holding that while the rents generated by the mall constitute property of the estate under state law, they constitute cash collateral to CPG's debt. The court also found that the Debtor did not provide adequate protection to CPG for its two (2) separate interests; namely, its mortgage on the

real property and its security interest in the post-petition rents. The court held that Debtor may not use CPG's cash collateral (the post-petition rents).

18. Wendy's is one of the tenants of the mall. Mr. Franco González is Vice President of development and Real Estate for Wendco and is in charge for the Wendy's located at the mall.

19. Mr. González visited the mall on November 17, 2013 and in testimony the following day he stated that the condition of the mall has become much more adverse since August 5, 2013, when related his observations of that date that appear as Exhibit 1 at pp. 7-9 (Docket No. 66-2).

20. The adverse conditions of the Shopping Center affect the business because it is not appealing to the customers because the mall is a safety hazard and a complete eyesore pursuant to Mr. González's testimony.

21. Mr. González stated that Wendy's would not be willing to pay a renewal fee if Mr. Jorge Rios Pulpeiro remains in charge of the Shopping Center's administration. Mr. González has dealt with more than 10 mall administrators in the last 5 years in more than 10 locations and opines that Mr. Jorge Rios' ability to manage the mall is not up to par.

22. Mr. González stated that he would like for Wendy's to stay in the mall and refurbish the store to Wendy's standard. However, although WendCo was interested in remaining in the Cupey Professional Mall, so long as Mr. Jorge Rios-Pulpeiro (Debtor's President) remains in charge of the Cupey Professional Mall, WendCo would not be willing to pay any lease renewal fee.

23. Tenants of the Shopping Center (Exh. 1 Dkt. 66-2) attested to having "no confidence in Debtor's ability to manage the [Shopping Center]", and would favor that the same be managed "by a Bankruptcy Trustee or unrelated third party, rather than Debtor." The foregoing includes WendCo, from whom the Debtor unrealistically expects to collect $400,000 in a renewal fee. MLS Opinion at ¶¶ 13 – 16.

24. Mr. Héctor del Rio is the asset manager of the loans which are secured by the Cupey Professional Mall and manages the accounts related to these loans.

25. Mr. del Rio testified that CPG's proof of claim #11 (Exhibit 4) reflects the application of payments as shown on the Loan Application Payment Detail (Exhibit 5). The payments to the loan have been applied to the principal balance since the state court Judgment in the year 2011. FirstBank had in place an escrow account in the amount of $205,000.00 to cover property taxes. The funds in the escrow account were provided by another entity named La Trinidad Elderly. The monies in the escrow account may be applied to the principal of the loan. The monies in the escrow account have remained untouched by CPG. No other escrow accounts were inherited from FirstBank.

26. The Center for the Collection of Municipal Taxes ("CRIM") filed proof of claim #14-1 on August 29, 2013 in the amount of $1,610,156.84 of which $1,472,952.89 is listed as a secured claim. See Exhibit 6.

27. A CRIM statement of account balance as of October 31, 2013 reflects that the balance due for the property taxes has increased because the first semester property taxes for the year 2013-2014 have not been paid. See Exhibit 7.

28. Mr. del Rio stated that CPG is adversely affected by CRIM's increasing claim balance because CRIM is a secured creditor that is senior to CPG's secured claim, thus reducing CPG's interest in the property.

29. Debtor has not insured the Shopping Center. On the other hand, CPG/GS has insured the Shopping Center with commercial property insurance (Exhibit 17) and liability insurance (Exhibit 18). CPG paid for both insurance policies.

30. The tenants of the mall have been increasingly worried for a long time due to the deteriorating condition of the mall.

31.     The necessary improvements to the mall include the following: roof treatment, repaving of all the parking areas, repaint the mall inside and outside, and exterminating services need to be performed.

32.     Mr. del Rio is concerned about Mr. Jorge Rios Pulpeiro's ability to manage the mall because many years prior to the Debtor's filing of the bankruptcy petition, the mall lacked proper maintenance and necessary improvements.

33.     The Debtor has not paid employment taxes and this directly affects the property because it becomes a lien on the property. See Exhibit 10 (Tax Lien Certificate). Failure to pay property taxes to the CRIM and federal taxes is indicative of poor management.

35.     The Forbearance Agreement provides that the Borrower is solely responsible for the payment of insurance and property taxes. Exhibit 13, Forbearance Agreement (Docket No. 35-2).

36.     During the last seven (7) months, the Debtor has collected less than $10,000 from accounts receivables owed by affiliated corporations. The September 2013 monthly operating report reflects a balance of $2,100,300.68 from accounts receivables from affiliates (Exhibit 16 at 6; testimony of Jorge Rios at Dkts. 135 and 136; MLS Opinion at 7, ¶37. Debtor's inability to collect on its affiliated receivables is further compounded by the various insider transactions and numerous inter-company transfers between Debtor and the different companies owned by Mr. Jorge Rios of Exhibit 22 Sub-exhibits 8 – 10.

37.     CPA José Monge testified on November 18, 2013 that many of the lease contracts have lapsed.

38.     The Shopping Center is subject to liens totaling over $12.7 million, that is, CPG/GS' claim not less than $11.3 million (Exh. 4 at 4, testimony of Hector Del Rio); and CRIM senior property tax lien of not less than $1.4 million. CRIM Claim No. 14, H. Exh. 6. See also Dkt. 150 at

¶¶ 20 -22. Consequently, there is no equity for the Debtor in the Cupey Professional Mall. See also MLS Opinion at p. 10.

39.     The appraisal by Rafael Bonnin (Exh. 20) reflects a fair market value of $6.6 million as of November 14, 2013. See also MLS Opinion at ¶ 32. It cannot be reasonably denied that there is no equity for the Debtor. MLS Opinion at p. 10.

40.     The CRIM senior property tax lien increased on September 30, 2013 by not less than $92,000. H. Exh. 7, second line item. See also MLS Opinion at ¶¶ 20 – 22, as result of Debtor's failure to pay (neither timely, nor at all) the real property taxes for the first semester of 2013-2014.

41.     Debtor suffered a federal tax lien on its property arising from failure to pay employment taxes (FICA) in 2010. H. Exh. 10; Hearing Exh. 9 page 3. Debtor has made no request to the IRS to cancel such lien. Testimony of Jorge Rios at Dkts. 135 and 136. Debtor has also failed to remit income tax withholding from employees' salaries for all years 2007-2012. Schedule E, Dkt. 26-1, H. Exh. 12 second item. These failures to comply with employment tax obligations comprise one of the factors that lead CPG/GS to have no confidence in the ability of Mr. Jorge Rios, the Debtor's sole owner and chief officer, to manage either the Shopping Center or cash. Testimony of Hector Del Rio at Dkts. 135 and 136. See also MLS Opinion at ¶¶ 27 - 28.

42.     The Monthly Operating Report filed on November 20, 2013, shows that the Debtor has not made any remittance corresponding to Social Security withholdings for the month of October 2013. See, Dkt. 138 at pp. 22 – 24; Exhibit 22.

43.     Mr. Jorge Rios had no experience managing shopping centers prior to acquiring the Shopping Center, Testimony of Jorge Rios at Dkts. 135 and 136.

44.     Tenants have complained about Debtor's management and the deteriorating condition of the Mall. Tenants' Declaration, Dkt. 127-1, H. Exh. 19. Tenant Declaration ¶4 coincides with Mr.

Gonzalez' photograph of November 17, 2013 (H. Exh. 2). Tenant Declarations ¶¶ 3, 5, 9 are consistent with Mr. Gonzalez' November 17, 2013 photograph of the parking lot corner (H. Exh. 3). As confirmed by the testimony of Hector Del Rio, and the Tenants' Declaration (H. Exh. 19), many of the tenants have great concern over what is happening at the Mall and its physical condition. See also MLS Opinion at ¶¶ 25 - 27.

45. Tenant stability is critical for the success of the Mall. Testimony of Jose Monge at Dkts. 135 and 136.

46. Tenant dissatisfaction can adversely affect the value of the Mall. Testimony of Rafael Bonin at Dkts. 135 and 136. See also MLS Opinion at ¶ 33.

47. Many tenants are dissatisfied with the Debtor's mismanagement of the Mall, which places further risk on the value CPG/GS's collateral. H. Exh. 1, 19; testimony of Franco Gonzalez and Hector Del Rio at Dkts. 135 and 136. See also MLS Opinion at ¶¶ 13 – 16 and 25 - 27.

48. Debtor has not obtained insurance for the Mall. CPG/GS has force-placed two insurance policies, costing CPG/GS approximately $40,000 annually. H. Exh. 17, 18; testimony of Hector Del Rio at Dkts. 135 and 136. See also MLS Opinion at ¶¶ 23 - 24.

49. Debtor is also the developer of a certain construction project named Condominium the Hillview in Trujillo Alto, to which Debtor is still owner of certain units. Exhibit 8 (Amended Schedule A).

50. Prior to the filing of the instant bankruptcy case, the Hillview Condominium had been suffering from various deficiencies and construction vices which have endangered the security and well-being of its residents. This situation has led to the filing of certain complaints by its residents against the Debtor before the Puerto Rico Department of Consumer Affairs. Exhibit 21 Sub-Exhibit 2.

51. The issues affecting the Hillview Condominium have continued and remain ongoing to date.

52. At hearing on January 10, 2014, Jorge Rios Pulpeiro admitted that Debtor had not paid the real property taxes on Hillview Condominium due September 30, 2013 for the first semester of tax year 2013-14.

53. The Hillview Condominium is over encumbered property. Debtor could have abandoned such over encumbered property prior to the September 30, 2013 due date for payment of taxes for semester July 1-December 31, 2013, but did not do so. Further, Debtor has never contended that someone else was obligated to pay the real property taxes for properties which continued to own. Debtor's failure to dispose of Hillview Condominium is a further indication of gross mismanagement.

54. There are significant intercompany and insider transactions which a Chapter 7 Trustee could evaluate for potential recovery for the benefit of the Estate. Sub-exhibits 8 -20 of Exhibit 21. The foregoing includes in excess of $2,000,000 in intercompany receivables. Exhibit 22 (Dkt No. 138), p. 6 and 7.

55. The testimony of Mr. Carlos Otero showed lack of knowledge of the Debtor's finances and operations. He appeared not to have a clear understanding of whom he worked for in light of the several affiliates of the Debtor.

56. Mr. Jorge Rios Pulpeiro's testimony was inconsistent and also showed lack of knowledge of Debtor's finances. Therefore, the court finds that he reflected inability to effectively and efficiently manage the Cupey Mall.

CONCLUSIONS OF LAW

A. <u>There is cause to convert to chapter 7, under Section 1112</u>

The Bankruptcy Code provides at Section 1112(b) (1) the procedure and mechanism by which a party in interest may request the conversion or dismissal of a Chapter 11 case. Section 1112(b) of the Bankruptcy Code mandates the bankruptcy court, after notice and a hearing, to convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause and the case is devoid of unusual circumstances pursuant to 11 U.S.C. §1112(b)(2). 11 U.S.C. §1112(b) (1). Section 1112(b)(4) of the Bankruptcy Code fails to define what the term "cause" means but provides a list of circumstances which constitute "cause" for conversion or dismissal. This list of causes is no exhaustive, thus a case may be converted or dismissed for other causes. See AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. 398, 401 (Bankr. D. N.H. 2007).

The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is cause for either conversion or dismissal of the chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2013). "Thus, until the movant carries the burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. The court, after finding cause, has broad discretion to determine whether conversion or dismissal is in the best interest of creditors and the estate. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968 (B.A.P. 1st Cir. 2008); 2008 WL 4531982. However, if the movant proves that there is cause for dismissal pursuant to 11 U.S.C. §1112(b) (4) by the preponderance of the evidence standard, the court must find that movant has established cause. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2012).

Once "cause" has been established, the burden shifts to the debtor to identify unusual circumstances that evince that conversion or dismissal is not in the best interest of creditors and the

estate. Even, if there are no unusual circumstances, the court may not convert or dismiss a case if the debtor establishes and the court finds that: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Orbit Petroleum, Inc. 395 B.R. 145, 148 (Bankr. D. N.M. 2008).

Nevertheless, the party requesting conversion need only "demonstrat[e] the existence of any one of the statutory grounds for conversion that are enumerated in section 1112(b) of the Bankruptcy Code, or by showing other cause." In re Santiago Vela, 87 B.R. 229, 231 (Bankr. D.P.R. 1988).

The court may convert or dismiss a case "'for reasons that are not specifically enumerated in the section, provided that these reasons are sufficient to demonstrate the existence of cause.' In re Camann, 2001 WL 1757075, at *2 [Bankr.D.N.H.2001]. 'One ground, however, is sufficient, standing alone, to establish cause under the statute.' In re McKenna, 2011 WL 2214763, at *1 [D.R.I.2011]." In re Colón Martínez, 472 B.R. 137, 144 (B.A.P. 1st Cir. 2012).

## DISCUSSION

As discussed below, there is cause to convert to chapter 7 under subsections (B) and (I) of Section 1112(b) (4). Moreover, conversion and not dismissal is in the best interest of the creditors and the estate.

### Gross mismanagement of the estate

One of the enumerated "causes" to convert to Chapter 7 is when there exists a "gross mismanagement of the estate". 11 U.S.C. § 1112(b) (4) (B). According to Collier's, the mismanagement inquiry under section 1112(b) (4) (B) must be based on the post-petition conduct of

the Debtor. As such, "if mismanagement continues after the petition has been filed, it is not in the interest of creditors to permit continuance of gross mismanagement." 7-1112 Collier on Bankruptcy P 1112.04[6][b].

To determine "mismanagement of the estate", the case law requires that we look at Debtor's treatment towards its creditors. To wit: "A debtor in possession is vested with significant powers under the provision of the Bankruptcy Code. As is often the case, those powers come with certain responsibilities. Significantly, a debtor in possession owes a fiduciary duty to its creditors." (Emphasis supplied) In re Gateway Access Solutions, Inc., 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007), citing In re G-I Holdings, Inc., 385 F. 3d. 313, 319 (3rd Cir. 2004).

Testimony and declarations presented regarding the detrimental condition of the Shopping Center, while contradicted by Debtor, are still substantial and significant. See, MLS Opinion at ¶¶ 13 – 16 and 25 – 27. The weight of the evidence on physical deterioration is one of the factors that lead to the conclusion that Debtor grossly mismanaged the estate.

The situation fares perhaps even worse as to Debtor's remaining asset, the Hillview Condominium. According to Exhibit 21 Sub-Exhibit 2, the Hillview Condominium is in a total state of decay which has given rise to numerous complaints for construction vices and defects before the Puerto Rico Department of Consumer Affairs. Furthermore, a substantial number of tenants have filed claims alleging failures to properly construct, maintain, or provide physical facilities at Hillview Condominium. Debtor's inability to manage and/or resolve the health and safety issues which exist in Debtor's only other asset and project, the Hillview Condominium, shows gross mismanagement by the Debtor.

The Debtor has allowed the continued accrual of senior property tax liens for the first semester of tax year 2013-14 (MLS Opinion at ¶¶ 20 -22), and the Debtor's inability to comply with its employment tax obligations, such as its remittance of Social Security withholdings for the month

of October 2013 (a situation similar to that which gave rise to the imposition of a federal tax lien on its property arising from failure to pay employment taxes (FICA) in 2010). H. Exh. 10; H. Exh. 9 page 3. See also MLS Opinion at ¶¶ 20 – 22 and 27 – 28. There have been reported no efforts by the Debtor, either before or since the Petition Date, to discharge the federal tax lien. These are additional features showing gross mismanagement of the estate by the Debtor.

Debtor's failure to obtain insurance for the Shopping Center, requiring CPG/GS to force-placed two insurance policies, further supports CPG/GS' contention that Debtor has grossly mismanaged the estate.

Finally, the testimony of Debtor's two key representatives, Mr. Carlos Otero and Mr. Jorge Rios Pulpeiro showed that the management lacked adequate knowledge of Debtor's finances.

For the reasons detailed above, CPG/GS has sustained its burden to show cause under 1112(b) (4) (B), gross mismanagement of the estate.

**Failure to timely pay taxes**

Section 1112(b)(4)(I) of the Bankruptcy Code provides that a case may be converted to Chapter 7 for "failure [to] timely pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief". 11 U.S.C. § 1112(b) (4) (I).

There is ample evidence in this case of Debtor's post-petition accumulation of real property taxes (CRIM Claim No. 14, H. Exh. 6, MLS Opinion at ¶¶ 20 -22), including the $87,000 that were due upon the Shopping Center on September 30, 2013, during the chapter 11 administration. Further, Debtor admitted not having paid the real property taxes on Hillview Condominium which were due September 30, 2013, during the chapter 11 administration. The Debtor has not complied with post-petition employment tax obligations, including but not limited to employment tax remittances during the second half of 2013, a tax due during the chapter 11 administration.

Therefore, even considering alone the property taxes due September 30, 2013 on the Shopping Center and on the Debtor's Hillview Condominium property, and the federal employment taxes due no later than October 2013, there is cause established pursuant to 11 U.S.C. § 1112(b)(4)(I).

### Conversion is in the best interest of creditors.

To determine whether a case should be dismissed or converted, this Honorable Court must make a determination under section 1112(b), which "invokes a two-step analysis, first, to determine whether 'cause' exists either to dismiss or to convert the chapter 11 proceeding to a chapter 7 proceeding, and second to determine which option is in the best interest of creditors and the estate." Rolex Corp. v. Associated Materials, Inc., 14 F.3d 240, 242 (4th Cir. 1994); see also In re Mechanical Maintenance, Inc., 128 B.R. 382, 386 (E.D. Pa. 1991) ("Once the threshold is passed and cause is found to exist, the decision whether to convert to Chapter 7 or to dismiss is committed to the discretion of the bankruptcy court … The choice of conversion or dismissal must be based, nevertheless, on a 'best interest of creditors and the estate' test.").

To determine whether a case should be dismissed or converted, the Court must make a determination under section 1112(b), which "invokes a two-step analysis, first, to determine whether 'cause' exists either to dismiss or to convert the chapter 11 proceeding to a chapter 7 proceeding, and second to determine which option is in the best interest of creditors and the estate." Rolex Corp. v. Associated Materials, Inc., 14 F.3d 240, 242 (4th Cir. 1994); see also In re Mechanical Maintenance, Inc., 128 B.R. 382, 386 (E.D. Pa. 1991) ("Once the threshold is passed and cause is found to exist, the decision whether to convert to Chapter 7 or to dismiss is committed to the discretion of the bankruptcy court … The choice of conversion or dismissal must be based, nevertheless, on a 'best interest of creditors and the estate' test.").

In this case, conversion is in the best interest of the Creditors. CPG/GS had advised prior to the December 2, 2013 hearing, that upon removing from the Estate the burden of Debtor's current mismanagement, CPG/GS would be amenable to enter into discussions with the appointed Chapter 7 trustee to consent to the use of CPG/GS's cash collateral to stabilize the operations of Shopping Center pending the liquidation of the same with a carve-out to pay some classes of non-secured creditors. This would inure also to the benefit of the tenants, whose own operations would be benefited and whom could continue operating at Shopping Center. Subsequent to the hearing and conversion, CPG/GS did stipulate to the chapter 7 trustee's use of cash collateral (Dkt. No. 204) and to a carve-out for to pay some classes of non-secured creditors.

Furthermore, the Debtor has reported significant intercompany and insider transactions which a chapter 7 Trustee could monetize for the benefit of the Estate. See, Exhibits 8 -20 of Exhibit 21. The foregoing includes in excess of $2,000,000 in intercompany receivables. A chapter 7 Trustee with CPG/GS's consent, could use cash collateral, properly supervise the Estate, and address the safety concerns of the tenants.

On the other hand, dismissal will likely lead to a refiling by this Debtor, as CPG/GS already holds a final judgment to foreclose the Shopping Center. The likelihood that the Debtor will re-file underscores that an orderly transition through Chapter 7 is in the best interests of tenants when compared to foreclosure. The court notes that Debtor's insiders have already sought to supplant the trustee's administration, by their request (Dkt. 245) to represent the estate in the pending foreclosure action in the Superior Court of Puerto Rico. As the trustee is the exclusive representative of the estate, by separate order we are denying leave for these insiders to assume the trustee's rights and duties relative to that plenary litigation.

A Chapter 7 Trustee with CPG/GS's consent, may use cash collateral with a secured creditor's consent, collect the outstanding intercompany amounts, properly supervise the Estate, and

address the safety concerns of the tenants. On the other hand, dismissal will likely lead to a refiling by this Debtor, as CPG/GS already holds a final judgment to foreclose the Shopping Center. The likelihood that the Debtor will re-file underscores that an orderly transition through Chapter 7 is in the best interests of tenants, and non-secured creditors because of a carve-out, when compared to dismissal.

The totality of the circumstances shows that the creditors and the estate will be best served by a conversion to chapter 7. A dismissal may invite the filing of a new petition, frustrating the efforts expended by creditors in this case. A chapter 7 trustee may be in a better position to recover preferential or fraudulent transfers. On the other hand, the proven mismanagement of the Debtor would not benefit the creditors and the estate outside bankruptcy.

## CONCLUSION

In view of the foregoing, the court finds and concludes that there is cause to convert or dismiss under Sections 1112 (b) (4) (B),(I); and that conversion to chapter 7, not dismissal, is in the best interest of creditors and the estate.

SO ORDERED.

In San Juan, Puerto Rico, this 8 day of May 2014.

_____
Enrique S. Lamoutte
Chief. U.S. Bankruptcy Judge

00139541; 1                                                    -17-